624 F.2d 525
 23 Fair Empl.Prac.Cas. 748,
23 Empl. Prac. Dec. P 31,186
 Louis SWINT and Willie James Johnson, on behalf of
themselves and others similarly situated,
Plaintiffs-Appellants,
v.
PULLMAN-STANDARD, Bessemer, Alabama, United Steelworkers of
America, Local 1466, United Steelworkers of America, AFL-CIO
and International Association of Machinists and Aerospace
Workers, AFL-CIO, Defendants-Appellees.
 
 No. 78-2449.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 18, 1980.
 Oscar W. Adams, Jr., Birmingham, Ala., Elaine R. Jones, Washington, D. C., for plaintiffs-appellants.
 C. V. Stelzenmuller, D. Frank Davis of Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., Franklin B. Snyder, Chicago, Ill., for Pullman-Standard.
 Cooper, Mitch & Crawford, John C. Falkenberry, Birmingham, Ala., Bernard Kleiman, Chicago, Ill., Carl B. Frankel, Pittsburgh, Pa., for United Steelworkers of America, Local 1466, United Steelworkers of America, AFL-CIO.
 Appeal from the District Court for the Northern District of Alabama.
 Before WISDOM, RONEY and HATCHETT, Circuit Judges.
 HATCHETT, Circuit Judge:
 
 
 1
 In this class action employment discrimination suit, before us for the second time, we review judgments of the district court rejecting claims of racial discrimination in employment. The claims are primarily aimed at the establishment and continuation of a departmental seniority system and the selection of supervisory personnel. Because we find certain conclusions of the district court to be inconsistent with the applicable case law and unsupported by the record, we reverse the judgments and remand for proceedings necessary to render appropriate relief.
 
 
 2
 The original complaint in this action was filed on October 19, 1971, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981. The claims of racial discrimination were made against Pullman-Standard, a division of Pullman, Inc., a manufacturer of railway freight cars and parts, United Steelworkers of America (U.S.W.) and its Local 1466, the bargaining representative of most of the production and maintenance workers at Pullman-Standard. Leave of court was granted to amend the complaint to add as a defendant, for purposes of relief other than money damages, the International Association of Machinists (I.A.M.), the bargaining representative of other departmental units at Pullman-Standard. The class was certified pursuant to Fed.R.Civ.P. 23(b)(2) on behalf of all black persons who worked at any time "within one year prior to the filing of any charges under Title VII."
 
 
 3
 In July and August of 1974, a sixteen-day trial was held in the United States District Court for the Northern District of Alabama. Appellants challenged discrimination in the departmental seniority system negotiated by the appellees, its procedure for assignment of work within the same job classification, promotions to supervisory positions, lack of job posting, and the discharge of plaintiffs' and plaintiff-intervenor Clyde Humphrey. At the close of appellants case, the U.S.W. and Local 1466 filed motions for involuntary dismissal of the claims asserted by plaintiff-intervenor Clyde Humphrey that the union failed to represent them because of their race. The motion was granted and those claims were dismissed. On September 13, 1974, the district court denied the appellants' several claims of racial discrimination. On appeal to this court, we affirmed the judgment in part and remanded in part for further proceedings with respect to the issues of the seniority system and the selection of supervisors. Swint v. Pullman-Standard, 539 F.2d 77 (5th Cir. 1976).
 
 FACTS
 
 4
 We need not restate the extensive factual background contained in our decision on the first appeal, Swint v. Pullman-Standard. The following facts are helpful, however, in discussing the issues relevant to this second appeal.
 
 
 5
 Since the first collective bargaining agreements were negotiated between Pullman-Standard and the U.S.W. and I.A.M. in 1941, seniority was measured by length of continuous service in a particular department. Seniority has been exercised in the event of increases and decreases of forces, in competition with all other employees in that department. Under the company-wide collective bargaining agreement negotiated in 1954, there were no lines of promotion or progression in any department. Seniority was not formally recognized for promotional purposes until 1956. There was no carryover of seniority. Employees transferring from one department to another were treated as "new" employees in the department to which transferred, and, with limited exception for those transferring at the request of the company or electing transfer in lieu of lay-off, also lost their seniority in the "old" department. Seniority rosters at the company were maintained by department. Departmental age was basically the sole criterion used to determine who was rolled-back or laid-off in the event of reductions, and who was recalled or promoted in the event of force increases or other vacancies in the department. The seniority system in effect in 1954 remained virtually unchanged through the next eighteen years of collective bargaining between Pullman-Standard, and the U.S.W. and I.A.M.
 
 
 6
 In 1972, provisions were made in an agreement with the Office of Federal Contract Compliance (O.F.C.C.), to permit black employees hired before April 30, 1965, to transfer from predominately black departments or to predominately white departments, in either case, with carryover of seniority. The restriction against carryover of seniority on departmental transfers continued in effect as to black employees when transferring from a "mixed" department to another "mixed" department, as well as to black employees hired after April 30, 1965, and to white employees.
 
 
 7
 Until the arbitration decision in March of 1965, there was an informal custom at the plant of treating certain jobs as "white only" and others as "black only." This practice caused decisions respecting assignments to departments throughout the plant to be infected during that period with racial considerations. According to the plaintiffs, the effects of this discrimination in the departmental assignments have been perpetuated by the seniority system a system which determines employment rights on the basis of departmental age, and which, even with the 1972 changes, provides barriers to departmental transfers.
 
 
 8
 Prior to June 1965 there were no black foremen at Pullman-Standard. At the time of the first trial, approximately ten percent of the salaried foremen were black. The labor market, at the time of this trial, ranged from twenty-five to thirty-five percent black, depending on the age group and area selected. Pullman's work force, depending upon the time selected, ranges from approximately forty-five to almost fifty percent black. Selection of foremen is made by groups of supervisors, without any objective standards or tests. The plant manager and superintendent choose department heads (C foremen) who in turn select track supervisors (B foremen), production foremen (A or salaried foremen), and hourly (temporary) foremen. The first black salaried foreman was not promoted to the then 143 existing salaried foreman positions until 1966. Four years later, there were nine black salaried foremen and 151 white foremen. Up until the time of trial, blacks had never been offered either salaried or temporary foreman positions in thirteen of the twenty-eight departments at Pullman-Standard. From 1966 until the time of trial, only twelve blacks were selected to fill fifty-nine salaried foreman vacancies.
 
 THE DISTRICT COURT'S ORDER
 
 9
 On July 5, 1977, the district court, pursuant to our remand for further proceedings with respect to issues regarding the validity of the seniority system and the selection of supervisors, concluded that the seniority system at Pullman-Standard does not discriminate against blacks, is "valid" under 42 U.S.C. § 2000e-2(h), and the appellees did not follow any practice or policy after the effective date of the Act which discriminated against blacks in the assignment of employees to departments; further, the appellants' prima facie showing of discrimination in the selection of supervisory personnel has been rebutted by the appellees, and no such discriminatory practice existed subsequent to 1966. At the request of appellants, the district court granted a new trial for the limited purpose of receiving new evidence which would have been relevant under the Supreme Court's decision in Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The present case was under submission when Teamsters was decided and had been tried at a time when all concerned acted under what turned out to be an erroneous view of the law. On May 8, 1978, after hearing further evidence, the district court entered an order finding the seniority system in question to be "bona fide" within the meaning of section 703(h) of Title VII.
 
 ISSUES
 
 10
 The critical issues before us are: (1) whether Pullman-Standard made racially discriminatory assignments to departments after the effective date of Title VII of the Civil Rights Act of 1964, (2) whether the seniority system at Pullman-Standard is "bona fide" within the meaning of § 703(h) of Title VII, and (3) whether Pullman-Standard successfully rebutted appellants' prima facie case of racial discrimination in the selection of foremen.
 
 
 11
 * The appellants argue that the district court erred in its finding that Pullman-Standard's post-Act assignments to departments were not racially motivated. In Teamsters v. United States, the Supreme Court held that a finding of validity respecting a seniority system does not thereby preclude the implementation of remedial measures for persons who seek relief from an employer's post-Act hiring discrimination. See Franks v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Based upon Teamsters, and Franks, the district court proceeded to make an initial determination whether the seniority system was "valid" under 42 U.S.C. § 2000e-2(h). After finding that the seniority system does not discriminate against blacks and is therefore "valid," the court considered whether there were discriminatory assignments to departments on and after December 27, 1966,[1] and found that there were not.
 
 
 12
 To facilitate its evaluation of the issue of post-Act departmental assignments, the district court utilized statistics obtained from the company's records, which consisted of seniority lists for the years 1965 to 1973.
 
 
 13
 The district court made a chart showing, for back years starting June 1966, the number of individuals by race, assigned to each of the twenty-eight departments at Pullman-Standard. The court found it useful to look particularly at assignments after December 1966, in the six formerly one-race departments. Although the district court did not reproduce the chart in its Memorandum Opinion, the court interpreted from the chart that Pullman-Standard, after December 1966, was no longer making assignments to departments based on race, except to the extent of attempting to rectify imbalances caused by its earlier discriminatory practices.
 
 
 14
 "In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts. Jones v. Lee Way Motor Freight, Inc., (431 F.2d 245 (10th Cir. 1970));" United States v. Jacksonville Terminal Co., 451 F.2d 418, 442 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972).
 
 
 15
 Our review of the exhibits upon which the district court based its conclusion reveals erroneous interpretations of the statistics contained therein. In 1966, the Die & Tool Department (I.A.M.) included seventy-seven whites and no blacks. The district court found that six blacks and one white were assigned to the Die & Tool Department (I.A.M.), in 1966, and over the next four years, seven other blacks and eight whites were assigned to it. Our review of the evidence indicates that between 1965 and 1970, the company made approximately thirty-six new assignments to this department, all white persons. The first black was assigned to the department in 1970. In 1971, seven whites were assigned to the department along with two more blacks.
 
 
 16
 In 1966, there were seventy whites in the Maintenance Department (I.A.M.), and no blacks. The district court found that the first post-1966 assignments to the Maintenance Department (I.A.M.), were three blacks and four whites. The record evidence establishes that the company assigned seven new employees to this department between 1967 and 1970, all of whom were white. The first blacks were assigned to the department in 1970 when six blacks were assigned to the department along with four whites.
 
 
 17
 The district court found that, subsequent to 1966, the first vacancies in the other previous all-white departments are filled by blacks and the first vacancies in the previous all-black departments are filled by whites. At this point, the court essentially ended its analysis and concluded that there was no policy or practice of discriminatory departmental assignments after December 1966. Our examination of the statistics is in the context of the plant as a whole. Although the statistics disclose that the company made significant advancements in the elimination of previous all-black and all-white departments subsequent to 1966,[2] the total employment picture indicates that departmental assignments continued to be infected with racial considerations, albeit to a lesser degree than during the pre-Act period.
 
 
 18
 We find the district court's conclusion that no discrimination existed in post-Act assignments to be factually unsubstantiated. We have carefully reviewed the post-Act assignment statistics and, taken as a whole, they clearly support the appellants' contention that Pullman-Standard discriminated against blacks in the assignment of employees to departments after the applicable period.
 
 II
 
 19
 The appellants argue that the district court erred in concluding that the departmental seniority system is "bona fide" within the purview of Section 703(h) of the Civil Rights Act of 1964.
 
 
 20
 In Teamsters v. United States, the Supreme Court held that, absent a showing of discriminatory purpose in a seniority system, that system is protected by § 703(h), 42 U.S.C. § 2000e-2(h) from attack on Title VII grounds. Harris v. Plastics Mfg. Co., 617 F.2d 438 (5th Cir. 1980). Fisher v. Proctor & Gamble Manufacturing Co., 613 F.2d 527 (5th Cir. 1980). Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir. 1978). Southbridge Plastics Division, etc. v. Local Valves & Fittings Co., 565 F.2d 913 (5th Cir. 1978). James v. Stockham Valves & Fittings Co., 559 F.2d 310 (1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). Section 703(h), provides in pertinent part:
 
 
 21
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race.
 
 
 22
 In James v. Stockham Valves & Fittings Co., we noted that the analysis in Teamsters suggests that the totality of the circumstances in the development and maintenance of a seniority system is relevant to examining "whether there has been purposeful discrimination in connection with the establishment or continuation of a seniority system (which is) integral to a determination that the system is or is not bona fide." James, at 351. James extracts four factors from Teamsters which are helpful in deciding this issue:
 
 
 23
 1. Whether the seniority system operates to discourage all employees equally from transferring between seniority units;
 
 
 24
 2. Whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);
 
 
 25
 3. Whether the seniority system has its genesis in racial discrimination; and
 
 
 26
 4. Whether the system was negotiated and has been maintained free from any illegal purpose.
 
 
 27
 James, at 352.
 
 
 28
 Although the district court appropriately utilized the analysis provided in James, we are not satisfied that the court's ultimate conclusion is amply supported by the record evidence.
 
 
 29
 In consideration of "(w)hether the seniority system operates to discourage all employees equally from transferring between seniority units," James, at 352, the district court made several findings. It found that the departmental seniority system was applied in a uniform manner, regardless of race or color, and that the limited number of interdepartmental transfers granted were handled in a fair and nondiscriminatory manner. The district court found that, to the extent the seniority system "locks" employees into a department and discourages transfers, it does so equally for both whites and blacks that is, it did so until 1972. The district court acknowledged that a somewhat greater impact might be felt by blacks than by whites if one were to rank the 28 U.S.W. and I.A.M. departments according to some perceived order of desirability to determine which group was the more discouraged from transferring. According to the district court, such a study of relative economic desirability would be inappropriate in light of the rationale in our decision on the previous appeal, 539 F.2d 77 (1976). As the district court stated in its order, "if one is to measure inequality without reference to economic desirability, it would seem logical to likewise measure its opposite equality or neutrality without reference of such desirability." Our holding that appellants need not show that they were assigned discriminatorily to less desirable departments in order to prove a prima facie case of racial discrimination cannot reasonably be construed to preclude consideration of the fact that by locking blacks into the least remunerative departments a greater impact was felt by blacks than by whites.
 
 
 30
 While acknowledging differences in the departmental structure at Pullman-Standard from those at other Pullman plants, the district court did not find such differences sufficient to establish the departmental structure to be irrational or inconsistent with industry practices. The court concluded that the seniority units at Pullman-Standard constitute a rational structure, "in context, and taken as a whole." They are, according to the district court, consistent with practices which were, at the time, generally followed at other unionized plants throughout the country, at other companies in the same industry, and at Pullman plants located outside of the south where race was presumably not a potential consideration. In attacking the rationality of the seniority units, appellants primarily attacked the two separate Die & Tool Departments and the two separate Maintenance Departments at Pullman-Standard. No similar situations existed at Pullman's other plants.[3] No such division existed at Pullman-Standard prior to unionization and seniority. The district court placed primary responsibility for this situation on the N.L.R.B. In 1941, at the request of the petitioning unions, the N.L.R.B. divided the plant into three representational units for election purposes. This was allegedly done over the opposition of the predecessors of the U.S.W.,[4] which sought to represent all production and maintenance employees. The district court did not find this circumstance to diminish the bona fides of the seniority system between the company and the U.S.W. The court asserted that the separation within the various units was not, as in Teamsters, "consistent with National Relations Board precedent," Teamsters, 431 U.S. at 356, 97 S.Ct. at 1865; but was required by a specific decision of the N.L.R.B. and the outcome of the elections. Accordingly, the court found the departmentalization at Pullman-Standard to be rational, in accord with industry practice, and consistent with N.L.R.B. policies.
 
 
 31
 The record evidence indicates that a significant number of one-race departments were established upon unionization at Pullman-Standard, and during the next twenty five years, one-race departments were carved out of previously mixed departments. The establishment and maintenance of the segregated departments appear to be based on no other considerations than the objective to separate the races.
 
 
 32
 As of the date of its certification to represent employees of Pullman-Standard, November 19, 1941, the I.A.M. unit included twenty-four black workers. Shortly thereafter, agreements between the I.A.M. and Steel Workers Organizing Committee (S.W.O.C.)[5] resulted in the I.A.M. giving its black members to the S.W.O.C. in return for two of the S.W.O.C.'s white members, which resulted in the I.A.M. being an all-white bargaining unit. The first U.S.W. contract with Pullman-Standard, providing for departmental seniority, excluded blacks from the better jobs. Blacks were relegated to the least remunerative departments. The creation of the new departments in the years subsequent to unionization involved continued separation of the races. The general effect of the new department was to restrict black workers to lower paying jobs. For example, the seniority rosters indicate that between 1947 and 1952, the all-white watchmen and all-black janitors were both in the Safety Department. The 1953 seniority list carries both jobs under a Plant Protection Department. The 1954 seniority list shows the janitors in an all-black Janitors Department and the watchmen in an all-white Plant Protection Department. They remained separate departments until the time of trial.
 
 
 33
 The evidence further indicates that the Pullman-Standard plant is the only one in the Pullman family with two separate bargaining units for its production and maintenance workers.
 
 
 34
 The record evidence, generally, indicates arbitrary creation of the departments by the company since unionization and an attendant adverse affect on black workers. The individual differences between the departmental structure at Pullman-Standard and that of other plants, and as compared with industry practice, are indicative of attempts to maintain one-race departments.
 
 
 35
 The district court determined that the seniority system in the present case has its genesis at a time when there was widespread racial segregation, but the system was not itself the product of this bias. The court took judicial notice of the widespread extent of segregation in the community in 1941-42, when organizational efforts were successful and the first collective bargaining agreements were signed, and also in 1954, when the seniority system in this litigation became essentially fixed. At both times, racial segregation was extensively practiced at Pullman-Standard, in the union hall, and in the community as a whole. Most of the jobs at the plant were, by custom, treated as "white only" or "black only." Bath houses, locker rooms, and toilet facilities were racially segregated. So were company records, including employee rosters, internal correspondence, records of negotiation sessions, and lists of persons picketing. The court acknowledged that in 1941, some of the "mixed" jobs even had different wage scales for whites and blacks. All of the company's officials, supervisors and foremen were white. Union meetings were conducted with different sides of the hall for white and black members, and social functions at the unions were also segregated.
 
 
 36
 The court found that, although the U.S.W. Local possessed some of the local trappings taken from an otherwise segregated society, it did not function in fact to foster and maintain segregation. Rather, it served a joint interest of white and black workers for a higher priority than racial considerations. Further, in 1954, as well as 1941 and the intervening years, blacks were involved actively in the leadership of the local union and had an equal vote in the formulation of the policies and positions of the union, the local not being dominated by whites.
 
 
 37
 The court took into consideration the plaintiffs' contention that the I.A.M. effectively eliminated blacks from its membership. The court dismissed the relevancy of this point by concluding that the U.S.W. cannot be charged with racial bias in response to the I.A.M. situation and that the U.S.W. sought to represent all workers, black and white, in the plant.
 
 
 38
 The district court's failure to recognize the I.A.M. as a party to the present case blemishes its consideration of the genesis of the seniority system. Although the I.A.M. is a party to the present case for purposes of relief other than money damages, it is indeed a party. The motives and intent of the I.A.M. in 1941 and 1942 are significant in consideration of whether the seniority system has its genesis in racial discrimination. The I.A.M. was one of the unions which unionized the company in 1941 and the evidence reflects that the I.A.M. manifested an intent to selectively exclude blacks from its bargaining unit, N.L.R.B. certification considerations notwithstanding. The record makes clear that blacks were restricted from the better jobs under the first U.S.W. contract. The district court itself indicated that the first instance disclosed by the record in which the U.S.W. sought to remove the restriction of "black only" jobs was in 1965. It is crystal clear that considerations of race permeated the negotiation and the adoption of the seniority system in 1941 and subsequent negotiations thereafter.
 
 
 39
 The district court found that the seniority system had been negotiated and maintained free from any discriminatory purpose. According to the court, this is not a situation, as was described in James v. Stockham Valves & Fittings Co., where a company has opposed broadening of seniority or has shown intransigent adherence to unlawful employment practices. The court asserted that the major impediment to employment opportunities for blacks the custom of treating certain jobs as reserved for members of a particular race was removed prior to the effective date of Title VII by the very instrument under attack, i.e., the seniority system. Finally, the court found that the provision for seniority by departmental age has been negotiated and maintained by blacks as well as whites.
 
 
 40
 The court concluded that it found at least three of the four factors provided for analysis in James, in addition to general considerations of the totality of the system under attack, to be adverse to the plaintiffs. Therefore, the system was determined to be "bona fide."
 
 
 41
 Having carefully reviewed the evidence offered to show whether the departmental seniority system in the present case is "bona fide" within the meaning of section 703(h) of Title VII, we reject the district court's finding.
 
 
 42
 An analysis of the totality of the facts and circumstances surrounding the creation and continuance of the departmental system at Pullman-Standard leaves us with the definite and firm conviction that a mistake has been made.[6] There is no doubt, based upon the record in this case, about the existence of a discriminatory purpose. The obvious principal aim of the I.A.M. in 1941 was to exclude black workers from its bargaining unit. That goal was ultimately reached when maneuvers by the I.A.M. and U.S.W. resulted in an all-white I.A.M. unit. The U.S.W., in the interest of increased membership, acquiesced in the discrimination while succeeding in significantly segregating the departments within its own unit.
 
 
 43
 The district court might have reached a different conclusion had it given the I.A.M.'s role in the creation and establishment of the seniority system its due consideration. No credible explanation has been advanced to sufficiently justify the separate seniority units. The Pullman-Standard plant remains the sole plant within the Pullman family with two separate bargaining units for its production and maintenance workers.
 
 
 44
 We consider significant in our decision the manner by which the two seniority units were set up, the creation of the various all-white and all-black departments within the U.S.W. unit at the time of certification and in the years thereafter, conditions of racial discrimination which affected the negotiation and renegotiation of the system, and the extent to which the system and the attendant no-transfer rule locked blacks into the least remunerative positions within the company. Because we find that the differences in the terms, conditions and standards of employment for black workers and white workers at Pullman-Standard resulted from an intent to discriminate because of race, we hold that the system is not legally valid under section 703(h) of Title VII, 42 U.S.C. § 2000e-2(h).
 
 III
 
 45
 The district court concluded that plaintiffs had made a prima facie case of racial discrimination in the selection of supervisory personnel but that the defendants rebutted it.
 
 
 46
 The district court accepted Pullman-Standard's insistence that "special skills" are needed to be supervisors. The court acknowledged the practice at Pullman of selecting salaried supervisors from the ranks of those who have purportedly demonstrated their capabilities as temporary foremen. This limitation was found by the court to be a bona fide occupational qualification, sufficient to rebut plaintiffs' prima facie showing with respect to salaried supervisors.
 
 
 47
 The court considered it appropriate in this case to analyze promotions to temporary foreman on a departmental basis. Promotions to temporary foreman are made according to the needs of the individual departments, they are made by the supervisory personnel in that department, and are made from the employees working in that department. The district court found this restriction of such temporary promotions to persons working in the particular department to be a "bona fide occupational qualification, justified by business necessity, under the evidence in this case."
 
 
 48
 The fact that blacks were concentrated in certain departments, and were not significantly represented in departments from which supervisors were selected as needed, was taken into consideration by the district court. The court focused on the large disparity in promotions in the Welding Department. During 1967 and 1968, there were twenty promotions in that department and not a single black was selected. The problem, according to the district court, was that black welders had only a few months of experience as welders at that time, and did not possess the skills needed to act as foremen in that department. This was considered not to be the result of any post-Act discrimination the company had actively sought and trained blacks to be welders. But, to prevent employment of unqualified welders, the company adopted procedures to verify qualifications.
 
 
 49
 First, the district court's finding that "the restrictions of . . . temporary promotions to persons working in the department is a bona fide occupation qualification, justified by business necessity . . . " confuses the definite distinction between a bona fide occupational qualification defense and a business necessity defense. Although the two concepts are similar and often confused, they are separate and distinct, and apply to different factual situations.
 
 
 50
 The doctrine of business necessity is operative when an employment criteria which is "fair in form, but discriminatory in operation" is otherwise shown by the defendant to be related to job performance. Griggs v. Duke Power Co., 401 U.S. 424 at 431, 91 S.Ct. 849 at 853, 28 L.Ed.2d 158. A bona fide occupational qualification, on the other hand, is deliberately calculated by the employer to discriminate. An employment criteria is justified under the bona fide occupational qualification defense when a certain sex, national origin, or religion is reasonably necessary to satisfy a particular business need. Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1970). See also, Phillips v. Martin Marietta Corp., 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971).
 
 
 51
 We proceed, therefore, to consider whether the defense set forth by Pullman-Standard qualifies as either a bona fide occupational qualification or a business necessity defense.
 
 
 52
 Title VII, 42 U.S.C. § 2000e-2(e)(1) permits discrimination in hiring and employment "where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." Neither race nor color is included in this section. We believe that the omission of race and color as bona fide occupational qualifications was deliberate and intentional on the part of Congress. Our interpretation of the legislative history of this section is that Congress did not view race as a qualification which could, conceptually, be reasonably necessary to the efficient operation of any business. Senators Clark and Case, the floor managers for the Civil Rights Bill in the Senate, submitted to the Senate an "Interpretative Memorandum" to explain the exception:
 
 
 53
 * * * (The Section) creates certain limited exceptions from these prohibitions (of section 703). First, it would not be an unlawful employment practice to hire or employ employees of a particular religion, sex, or national origin in those situations where religion, sex, or national origin is a bona fide occupational qualification for the job. This exception must not be confused with the right which all employers would have to hire and fire on the basis of general qualifications for the job, such as skill or intelligence. This exception is a limited right to discriminate on the basis of religion, sex, or national origin where the reason for the discrimination is a bona fide occupational qualification. Examples of such legitimate discrimination would be the preference of a French restaurant for a French cook, the preference of a professional baseball team for male players, and the preference of a business which seeks the patronage of members of particular religious groups for a salesman of that religion * * * (110 Cong.Rec. 7213; emphasis supplied).
 
 
 54
 Diaz v. Pan Am World Airways, Inc., 311 F.Supp. 559 at 569 (S.D.La.), rev'd. on other grounds, 442 F.2d 385 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). The legislature, therefore, has indicated that customer preference may be considered under the limited "bona fide occupational qualification" exception in the areas of religion, sex, and national origin, but not on grounds of race or color. See also, Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Since the alleged discrimination in this case is based on race, the bona fide occupational qualification exception cannot be applicable.
 
 
 55
 It is settled in this circuit that "the one and only justification for standards or procedures which operate to deny Blacks promotional opportunities" is the business necessity defense. Rowe v. General Motors Corp., 457 F.2d 348 at 354 (5th Cir. 1972). We provided in Rowe : "The only justification for standards and procedures which may, even inadvertently, eliminate or prejudice minority group employees is that the standards or procedures arise from a nondiscriminatory legitimate business defense. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Local 189, United Paper Makers and Paper Workers, AFL-CIO, SLC v. United States, (416 F.2d 980 (5th Cir. 1969))." Id. at 354. Further, we derived from Griggs v. Duke Power Co. three factors for determining whether promotional standards and procedures arise from a legitimate business necessity so as not to constitute a Title VII violation: "(1) The standards and procedures were not shown to be significantly related to successful job performance. (2) The procedures operated to disqualify a substantially higher rate of Blacks than Whites. (3) The jobs in question had formally been filled by whites as part of a longstanding practice of discrimination. . . . " Rowe at 355.
 
 
 56
 That factors two and three of the standard quoted above apply in favor of the appellants in this case is a foregone conclusion. In evaluation of the first factor, we are influenced by the lack of any articulated or defined skills which are necessary to perform capably as a temporary or salaried foreman at Pullman-Standard. Further, with regard to the promotion to temporary foremen of those within the particular department to which promoted, the evidence indicates that a substantial number of salaried and temporary foremen supervise departments in which they have never worked. We are additionally concerned about the low percentage of black supervisors in predominately black departments. We cannot agree that the business need advanced by the defendants for the limitation which restricts the promotion of blacks to supervisory positions is sufficiently compelling to override the significant racial impact of the limitation.
 
 
 57
 We have further held that for a practice, which is not intentionally discriminatory or neutral but perpetuates consequences of past discrimination, to be justified by business necessity, the practice must "not only foster safety and efficiency, but must be essential to that goal . . . and there must not be an acceptable alternative that will accomplish that goal 'equally well with a lesser differential racial impact.' " Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374 (5th Cir.), cert. denied, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). The district court did not expose any evidence sufficient to show that the limitation upon which the defendants' business necessity defense rests is essential to the safety and efficiency of the operations at Pullman-Standard, nor do we find evidence in the record to that end.
 
 
 58
 The district court further considered probative in its analysis of the defendants' rebuttal arguments the fact that blacks refused supervisory promotions to a greater degree than whites; and peer pressure directed by black employees against black foremen discouraged many blacks from displaying good supervisory qualities, from accepting promotions, and from remaining in supervisory positions.
 
 
 59
 These circumstances undeniably emanate from the very discrimination which the class members seek to eliminate. When insufficient initiatives which purport to rectify a personnel imbalance follow a history of preserving certain personnel positions for a select group based upon race, such peer pressure naturally and conveniently results therefrom. Furthermore, these variables relied upon by the district court do not weigh heavily enough to lessen the appellants' empirical conclusions that black employees were locked in the lower paying jobs and departments. See Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir.), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). We hold, therefore, that the defendants failed to rebut the plaintiffs' prima facie case of racial discrimination in the selection of supervisory personnel.
 
 IV
 
 60
 Pullman-Standard's claim, on appeal, that the class representatives in the present case have no standing to maintain this appeal because their individual claims have been mooted or destroyed is without merit. Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). See also, East Texas Motor Freight v. Rodriquez, 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 (1977); Franks v. Bowman Transportation Co.
 
 APPROPRIATE RELIEF
 
 61
 Having rejected the district court's finding that Pullman-Standard did not make racially discriminatory assignments to departments after the effective date of Title VII, that the seniority system at Pullman-Standard is "bona fide" within the meaning of § 703(h) of Title VII, and that Pullman-Standard has successfully rebutted appellants' prima facie case of racial discrimination in the selection of foremen, we reverse the judgments appealed from and remand to the district court for proceedings necessary to provide appropriate relief.
 
 
 62
 REVERSED AND REMANDED.
 
 
 
 [1]
 Although the first primary charge directly bringing into question the company's assignment policies was filed on May 11, 1970, a charge had been previously filed by an EEOC Commissioner on March 27, 1967 questioning the hiring and promotion practices of Pullman. Because the district court found this earlier charge to be susceptible to the interpretation that it related also to assignment and transfer matters, the court used the date 90 days before the March 27, 1967 Commission charge for its analysis
 The 1972 amendment to Title VII extended the time for filing charges to 180 days, and this extension has been considered to be effective retroactively. See, e. g., Davis v. Valley Distributing Co., 522 F.2d 827 (9th Cir. 1975). But, the district court asserts that it finds there was no practice of discriminatory assignments to departments after September 28, 1966 anymore than there was after December 27, 1966. The 180 day statutory period is inconsequential to this analysis. See generally, Fisher v. Proctor & Gamble Mfg. Co., 613 F.2d 527 (5th Cir. 1980); Clark v. Olinkraft, Inc., 556 F.2d 1219 (5th Cir. 1977).
 
 
 [2]
 As of the 1973 seniority list, the Boiler House Department remained the sole one-race (white) department. No assignments had been made, as of the time of trial, to that department since the effective date of Title VII
 
 
 [3]
 At Pullman-Standard, there are two Die and Tool seniority units and two Maintenance seniority units, each subpart being represented by a different union
 
 
 [4]
 The United Steelworkers (USW) evolved from the Steelworker's Organizing Committee (SWOC)
 
 
 [5]
 See footnote 4
 
 
 [6]
 Findings of fact by the district court in Title VII cases are not to be set aside unless they are clearly erroneous, Harrison v. Goodyear Tire & Rubber Co., 508 F.2d 678 (5th Cir. 1975), Fed.R.Civ.P. 52(a), that is, unless the appellate court is "left with the definite and firm conviction that a mistake has been committed." Kingsville Independent School District v. Cooper, 611 F.2d 1109, 1113 (5th Cir. 1980), quoting United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Where findings, however, are made under an erroneous view of controlling legal principles, the clearly erroneous rule does not apply, and the findings may not stand. See, Rowe v. General Motors Corp., 457 F.2d 348, 356 n. 15 (5th Cir. 1972); United States v. Pickett's Food Service, 360 F.2d 338, 341 (5th Cir. 1966)
 In East v. Romine, Inc., 518 F.2d 332 (5th Cir. 1975), we stated:
 Although discrimination vel non is essentially a question of fact it is, at the same time, the ultimate issue for resolution in this case, being expressly proscribed by 42 U.S.C.A. § 2000e-2(a). As such, a finding of discrimination or nondiscrimination is a finding of ultimate fact. (Cites omitted.) In reviewing the district court's findings, therefore, we will proceed to make an independent determination of appellant's allegations of discrimination, though bound by findings of subsidiary fact which are themselves not clearly erroneous.
 518 F.2d at 339.