UNITED STATES of America,
Plaintiff–Appellee,

v.

GEORGIA POWER COMPANY et
al., Defendants.

Charles KING et al.,
Plaintiffs–Appellants,

v.

GEORGIA POWER COMPANY et al.,
Defendants–Appellees.

Willie C. MOREMAN,
Plaintiff–Appellant,

v.

GEORGIA POWER COMPANY et al.,
Defendants–Appellees.

No. 79–4073.

United States Court of Appeals,
Fifth Circuit.
Unit B

Jan. 22, 1981.

Henrietta E. Turnquest, Decatur, Ga., for Charles King et al.

O. Peter Sherwood, Jack Greenberg, Judith Reed, New York City, for Willie C. Moreman et al.

Joel M. Cohn, E.E.O.C., Washington, D.C., for Equal Employment Opportunity Commission, amicus curiae.

Michael C. Murphy, Charles W. Whitney, Atlanta, Ga., Irving L. Gornstein, Atty., Appellate Sec., U. S. Dept. of Justice, Lutz Alexander Prager, Joel M. Cohn, Attys., E.E.O.C., Washington, D. C., for Georgia Power Co.

Adair, Goldthwaite & Daniel, P. A., Patrick M. Scanlon, James B. Coppess, Atlanta, Ga., for IBEW Local 84.

Before GEWIN, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

RONEY, Circuit Judge:

Plaintiffs appeal from an order of the district court, 470 F.Supp. 649, modifying a 1974 decree with respect to a racially discriminatory seniority system at Georgia Power Company. The district court found it had become inequitable to enforce changes required in the seniority system by the original decree because a recent Supreme Court decision sustained bona fide seniority systems, even though they have a racially discriminatory impact. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Concluding the seniority system here was not bona fide within the meaning of section 703(h) of Title VII, 42 U.S.C.A. § 2000e-2(h), and thus did not come within the *Teamsters* holding, we reverse.

This case began in 1968 when two race discrimination suits by private plaintiffs were consolidated with a Title VII pattern and practice suit brought by the United States against Georgia Power Company and seven locals of the International Brotherhood of Electrical Workers. The seven locals have since been combined into one local and the unions will be referred to herein as Local No. 84.

In 1971, following an extensive trial, the district court found unlawful many of Geor-

gia Power's employment practices. *United States v. Georgia Power Co.,* 3 Empl.Prac. Dec. ¶ 8318 (N.D.Ga.1971). Among other findings, the court found that prior to December 1963 Georgia Power had assigned all blacks to the lowest job classifications, those of Laborer, Janitor, Porter and Maid; all whites were assigned to other job classifications; and blacks were not permitted to transfer to higher job classifications. In 1963, blacks were permitted to transfer to other job classifications only if they possessed a high school education and achieved a passing score on one or more aptitude tests. Such requirements were not imposed for any other transfers within the company.

Layoffs, promotions, demotions, work locations, shift assignments, and other competitive aspects of employment at Georgia Power were based on seniority. Seniority rights at Georgia Power were determined on the basis of the amount of time an employee had spent in his particular job level and in his seniority unit. Except for the special conditions imposed on blacks, transfers between units were permitted, but seniority gained in one unit could not be transferred to the new unit. In the event of a layoff, however, seniority in the old unit could be used to reacquire a job in the old unit.

The four lowest job classifications were maintained as separate seniority units, so that between 1963 and 1969, any black transferring from those job classifications to a traditionally all–white job was required to give up all his seniority rights. Unlike other seniority units, which were part of lines of progression and through which an employee could advance as he accumulated seniority, the four lowest job classifications were not part of any line of progression. Thus, in order for blacks to advance to a better, higher–paying job, they had to forfeit their seniority.

In 1969, the collectively bargained–for seniority system was modified slightly so that Laborers became members of the sections in which they had been working, and the seniority they had acquired as Laborers became the section seniority in that unit. The classifications of Janitor, Porter and Maid, however, remained in separate seniority units with no chance to progress except by transfer to another section with loss of seniority.

The district court found Georgia Power's practices prior to 1963 operated to keep black employees perpetually beneath contemporaneously hired whites. The court ordered that time spent in the four lowest classifications prior to 1963 be credited toward any future promotion. As to the practices after 1963, however, the court held that since blacks were free to transfer out of the lower classifications on the same basis as whites and in preference to a new hiree and since under the 1969 collective bargaining agreement time spent as a Laborer was counted as seniority in that unit, operation of the seniority system after 1963 did not subject blacks to unequal treatment because of their race. The court found the high school diploma requirement unlawful but the testing program lawful under *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

On appeal to this Court, the finding that the testing program was lawful was vacated and the question was remanded for further consideration. *United States v. Georgia Power Co.,* 474 F.2d 906 (5th Cir. 1973). The district court's findings that the high school diploma requirement, recruiting and hiring practices, and the seniority system were unlawful were affirmed, but the district court was instructed that if the testing procedures were found to be unlawful, the class entitled to seniority relief should be expanded. Following our earlier case of *Local 189, United Papermakers & Paperworkers v. United States,* 416 F.2d 980 (5th Cir. 1969), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), this Court held that if the seniority system operated to lock in the effects of past discrimination, it would be subject to judicial alteration so as to permit victims of discrimination to move into their "rightful place."

Following remand to the district court, the parties agreed in 1974 to a consent decree. *United States v. Georgia Power Co.,* 7 Empl.Prac.Dec. ¶ 9167 (N.D.Ga.1974). The decree enjoined Georgia Power from using any unvalidated aptitude test in employment decisions. Among other relief granted, the decree ordered that affected class members would use their total time with the company for competitive seniority purposes rather than their time in a particular seniority unit, as the collective bargaining agreement required. The affected class was broadened to include all black Laborers hired before that job classification was made a part of previously all–white lines of progression in 1969 and all Laborers hired from 1969 to 1973 who were prevented from progressing within those lines of progression because of the unlawful testing and education requirements; all black employees hired before 1973 and assigned to the Janitor, Porter, or Maid classifications or other all–black jobs not connected with any lines of progression; and black applicants who were not hired on account of racial discrimination. No appeal was taken from the decree and the district court retained continuing jurisdiction of the case for the purpose of enforcing or clarifying its orders.

Then in 1977, the Supreme Court ruled that in the absence of purposeful discrimination, a bona fide seniority system may not be attacked as violating Title VII, even if it perpetuates the effects of past discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. at 324, 97 S.Ct. at 1843; *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 81–82, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977).

Thereafter, Local 84 moved to modify the decree so as to reactivate the collective bargaining agreement's seniority system as it was before alteration by the 1974 decree. The union contended that since the interpretation of Title VII underpinning the court's seniority decree had been invalidated in *Teamsters,* it was inequitable to enforce that decree. The United States opposed the modification on two grounds: that *Teamsters* did not require retroactive modification of existing decrees; and that the seniority system was not bona fide and thus did not come within the *Teamsters* rule. The court responded first, that its relief was merely prospective, *i. e.,* that the modification would not affect any rights secured during the pendency of the decree but would have prospective effect only; and second, there was no evidence before it indicating that the seniority arrangement was not bona fide within the meaning of Title VII.

The motion to modify the decree was granted in part. Relying on *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the court continued the seniority remedy as to those applicants who had wrongfully not been hired. As to the other classes of employees, however, the court vacated that portion of the decree giving them the right to use time with the company for seniority purposes rather than time in the seniority unit. Subsequent motions by the Government and private plaintiffs to reconsider were denied and this appeal was taken from that denial.

Because we reverse the district court on the ground that *Teamsters* did not justify modification of the decree, it is probably not necessary to discuss whether the court otherwise had the power to modify its earlier final decree. A short examination of that question may be in order, however, because the point is asserted on this appeal and if the court had no such power, we would never reach the issue concerning *Teamsters.*

■ The power of a court of equity to modify the prospective effect of its decrees in response to changed circumstances is "inherent in the jurisdiction of the chancery," *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932),

and is so well settled as not to require extensive discussion. *System Federation No. 91 v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855); *Bros Incorporated v. W. E. Grace Manufacturing Co.*, 320 F.2d 594 (5th Cir. 1963). Recognition of this power is found in Fed.R.Civ.P. 60(b)(5), which permits such modification upon a motion brought within a reasonable time when the district court is convinced "it is no longer equitable that the judgment should have prospective application."

Admittedly the only change after the 1974 decree which could arguably make it inequitable for the judgment to have prospective effect was the decision in *Teamsters*. As to whether a change in decisional law alone is sufficient ground for a Rule 60(b)(5) modification, there is a great deal of inconsistency among and even within the various circuits. For example, the First Circuit specifically held in *Theriault v. Smith*, 523 F.2d 601 (1st Cir. 1975), that when a definitive Supreme Court decision represents a fundamental change in the legal predicates of a consent decree, that presents the kind of situation in which prospective relief should be available under Rule 60(b)(5). A district court's order vacating a consent decree was affirmed. In *Lubben v. Selective Service System*, 453 F.2d 645 (1st Cir. 1972), however, the same court stated that "a change in applicable law does not provide sufficient basis for relief under Rule 60(b)(5)." *Id.* at 650. Similar contradictions can be found in the case law of several circuits. In the Third Circuit, compare *Jordan v. Erie School District*, 548 F.2d 117 (3d Cir. 1977) (Supreme Court's opinion in *Goss v. Lopez*, 419 U.S 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), justified modification in consent decree) with *Mayberry v. Maroney*, 558 F.2d 1159 (3d Cir. 1977) ("[I]t is settled that Rule 60(b)(5) does not contemplate relief based merely upon precedential evolution." *Id.* at 1164). In the Seventh Circuit, compare *Western Union Telegraph Co. v. International Brotherhood of Electrical Workers,*

*Local No. 134*, 133 F.2d 955 (7th Cir. 1943), with *De Filippis v. United States*, 567 F.2d 341 (7th Cir. 1977). In the Ninth Circuit, compare *Safe Flight Instrument Corp. v. United Control Corp.*, 576 F.2d 1340 (9th Cir. 1978), with *Title v. United States*, 263 F.2d 28 (9th Cir.), *cert. denied*, 359 U.S. 989, 79 S.Ct. 1118, 3 L.Ed.2d 978 (1959).

While the Supreme Court has not spoken definitively on the subject, there are strong indications in at least two of its opinions that an injunction may be modified on the basis of a change in the case law. The Court held in *System Federation No. 91 v. Wright*, 364 U.S. at 642, 81 S.Ct. at 368, that a district court "cannot be required to disregard significant changes in law or fact if it is 'satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.'" 364 U.S. at 647, 81 S.Ct. at 371, *quoting United States v. Swift & Co.*, 286 U.S. at 114–15, 52 S.Ct. at 462. *System Federation* involved a change in statutory law, but the Court did say in dictum that "[t]here are many cases where a mere change in decisional law has been held to justify modification of an outstanding injunction. [Citations]." 364 U.S. at 650 n. 6, 81 S.Ct. at 372 n. 6. In *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), the Court was confronted with the refusal of a district court to modify its earlier injunction. The terms of the injunction were inconsistent with the intervening ruling in *Swann v. Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and were also ambiguous. Because of these two factors, the Court held, it was an abuse of discretion for the district court *not* to modify its earlier injunction.

■ The principal case in this Circuit is *Elgin National Watch Co. v. Barrett*, 213 F.2d 776 (5th Cir. 1954). In that case, on the basis of the interpretation of the Fair Trade Act announced in *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), the district court vacated the injunction it had entered almost three years earlier and

dismissed the original complaint upon which the final decree of injunction had been entered. This Court held that because the original judgment had not been appealed, it was improper for the district court to vacate the final judgment. This Court affirmed, however, as to the dissolution of the prospective operation of the permanent injunction, stating that such a modification was within the discretion of the trial court and, if consistent with accepted legal principles, would not be disturbed on appeal except for abuse of discretion. 213 F.2d at 780. Under the Barrett holding and in view of the Supreme Court authority cited above, we conclude that in this Circuit, given otherwise appropriate circumstances, a significant modification in decisional law will permit the district court in its sound discretion to prospectively modify a permanent injunction under Rule 60(b)(5). In a case very similar to this one, the Fourth Circuit sitting en banc recently concluded that the Supreme Court's decision in Teamsters permitted the modification of an earlier injunctive decree. Patterson v. American Tobacco Co., 634 F.2d 744 (4th Cir. 1980).

When an injunction is modified on the basis of an intervening change in decisional law, that modification must be justified by the new decision. We observe, as did the Tenth Circuit in an analogous situation in EEOC v. Safeway Stores, Inc., 611 F.2d 795, 801 (10th Cir. 1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980), that "Teamsters prohibits abrogation of a seniority system only if that system is bona fide." Thus, Teamsters would justify the district court's discretionary modification of the earlier decree only if the seniority system came within the statutory definition of bona fide. See Patterson v. American Tobacco Co., 634 F.2d at 750. If the seniority system was not bona fide, however, the previously invalidated system would not be protected under section 703(h) and Teamsters, see Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1189 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), and accordingly it would be error for the district court to modify its decree on the basis of Teamsters.

Thus, we must examine whether the district court was correct in its conclusion that the seniority system modified by the 1974 decree was bona fide when tested against the precedents of this Circuit. Since the disposition of this appeal turns on our resolution of this issue, we need not resolve the potential conflict over whether the modification in fact had only a prospective effect.

The key to the bona fides of a seniority system that may have a discriminatory effect is the absence of purposeful discrimination. In a case decided after the Supreme Court decision in Teamsters, James v. Stockham Valves & Fitting Co., 559 F.2d 310, 351 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), we held "the issue whether there has been purposeful discrimination in connection with the establishment or continuation of a seniority system is integral to a determination that the system is or is not bona fide." See Southbridge Plastics Division v. Local 759, International Union of Rubber Workers, 565 F.2d 913, 915 (5th Cir. 1978). To determine whether there has been purposeful discrimination, the court should examine the totality of the circumstances surrounding the seniority system, with particular emphasis on four factors the James court culled from the Supreme Court's analysis in Teamsters. Swint v. Pullman–Standard, 624 F.2d 525, 530–34 (5th Cir. 1980). These factors include: whether the seniority system operates to discourage all employees equally from transferring between seniority units; whether the seniority units are in separate bargaining units and, if so, whether that structure is rational and in conformance with industry practice; whether the seniority system had its genesis in racial discrimination; and whether the system was negotiated and has been maintained free from any illegal purpose. James v. Stockham Valves & Fitting Co., 559 F.2d at 352. Oth-

er factors may of course be considered. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d at 1192.

■ In modifying its decree in this case, the district court responded to the Government's contention that the system here was not bona fide by noting that the system was facially neutral and then holding:

> There is no evidence before the Court indicating that the seniority [system] provided for in the collective bargaining agreement between the Company and Local 84 is not "bona fide" as that term is used in section 703(h). Indeed, the Court notes that the system agreed to by the Company and Local 84 is not untypical of those negotiated through collective bargaining.

From the court's terse treatment of the issue, it is apparent that it overlooked a number of findings made in the 1971 and 1974 decrees. Although the question whether the seniority system was bona fide was not legally relevant then, an examination of those findings in light of the factors in *James* demonstrates that this system could not be found to be bona fide within the meaning of section 703(h) of Title VII.

Plaintiffs argue that a seniority system may be found non–bona fide on the basis of only one of the four *James* factors, *citing Sears v. Atchison, Topeka & Santa Fe Railway Co.,* 454 F.Supp. 158, 179 (D.Kan.1978); *Chrapliwy v. Uniroyal Inc.,* 15 Empl.Prac. Dec. ¶ 7933, at 6662 (N.D.Ind.1977). The issue under *James* and our subsequent decisions, however, is whether the *totality* of the circumstances demonstrates purposeful discrimination. Since we find that the Georgia Power seniority system does not pass muster under any of the four *James* factors and the totality approach, we need not and do not reach the issue whether purposeful discrimination can be demonstrated on the basis of only one of the four factors.

*Did the seniority system operate to discourage all employees equally from transferring between seniority units?* Any employee transferring between seniority units at Georgia Power lost all seniority rights, regardless of his race. Therefore, on its face, the seniority system operated equally upon all employees. This facial equality, however, was but a mask for the gross inequality beneath. As shown in the findings of fact, until January 16, 1970, only five black employees had ever been initially assigned to jobs higher than that of Laborer, Janitor, Porter, Coal Sampler, Switcher, or Maid. As of that same date, *no whites* had ever worked as Janitors, Porters, Coal Samplers, or Maids, and since the Laborer classification had been changed from an all–black job in 1963, only 58 whites had ever been assigned to that classification. Consequently, unlike in *Teamsters* where those discouraged from transferring to line–driver jobs were not predominantly members of minority groups, 431 U.S. at 355–56, 97 S.Ct. at 1864–65, here the overwhelming majority of employees discouraged by a total loss of seniority from transferring to the better–paying, more desirable jobs were black. In this way, the seniority system operated to "lock" black workers into inferior jobs. This penalty was compounded by the fact that blacks could not progress except by forfeiting their seniority. As this Court stated in the earlier appeal of this case:

> [B]lacks ran a greater risk than whites of losing their jobs if they wished to advance within the company. Since there were no higher jobs in the "lines of progression" into which blacks were hired, any transfer from one of the four entry–level jobs could prove lethal.

*United States v. Georgia Power Co.,* 474 F.2d at 926. It is thus apparent that in discouraging transfers between seniority units, the seniority system here did not operate equally on the races but had a disproportionately heavy negative impact on blacks.

*Were the seniority units in separate bargaining units and if so, was that structure rational and in conformance with industry practice?* One of the factors that led the Court in *Teamsters* to conclude the seniori-

ty system there was bona fide was that the separate seniority units were in separate bargaining units and the creation of separate bargaining units was consistent with National Labor Relations Board precedent and industry practice. 431 U.S. at 356, 91 S.Ct. at 1865. *Cf. Swint v. Pullman–Standard,* 624 F.2d at 532–33 (where separate bargaining units are inconsistent with industry practice and NLRB precedent, separate seniority units may be evidence of purposeful discrimination). Such an argument is unavailing here. The record shows that while at the time of trial there were separate locals divided along geographical lines, these locals each represented all union members of every job classification in its geographical area and all bargained jointly and entered into a single contract with Georgia Power. The separate locals were later consolidated into a single local. Thus, for purposes of this inquiry, there were no separate bargaining units and the "black" seniority units were therefore part of the same bargaining unit as the "white" seniority units. Any unequal treatment caused by the seniority system cannot be explained by or attributed to the division of bargaining units.

*Did the seniority system have its genesis in racial discrimination,* and *was the system negotiated and maintained free from any discriminatory purpose?* The record shows that the seniority system had its genesis in an era of overt racial discrimination at Georgia Power, when by formal policy blacks were prevented from holding any jobs other than those in the four lowest, most menial classifications. *Cf. Swint v. Pullman–Standard,* 624 F.2d at 530–31 (similar policies with respect to blacks). After formal segregation was officially ended, not only were these job classifications maintained as separate seniority units, but prior to 1969 these classifications were the only ones which were not connected to any line of progression. The "white" job classifications, on the other hand, were all part of lines of progression which permitted those employees to exercise their seniority to progress up the ladder. This structure,

whites being able to progress without transferring but blacks being able to progress only by committing "seniority suicide" and transferring to another unit, *see James,* 559 F.2d at 348, effectively nullified any seniority acquired by black employees.

As minor improvements were made in ridding Georgia Power's job classification scheme of its strictly segregated character, similar improvements were reflected in changes in the seniority system. For example, as the Laborer classification was desegregated, its position in the seniority scheme was improved. Those classifications which remained strictly "black", however, continued to be segregated from the mainstream of the seniority system up until the court's decree. It can be clearly seen from the findings of the district court that the seniority system negotiated through the collective bargaining process tracked and reinforced the purposefully segregated job classification scheme maintained by the company and the conclusion is inescapable that the seniority system itself shared in that same unlawful purpose. The seniority system under the collective bargaining agreement was but part and parcel of the total package of purposeful discrimination at Georgia Power. Considering the totality of the circumstances surrounding the seniority system, as found by the district court after trial, we hold the seniority system was not bona fide within the meaning of section 703(h).

Because the record contains positive findings that negate the bona fides of this seniority system, it is not necessary to remand the case to the district court for a decision on this point, as was required in *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d at 1192; *James v. Stockham Valves & Fitting Co.,* 559 F.2d at 353; and *Patterson v. American Tobacco Co.,* 634 F.2d at 750.

■ Local 84 argues that a statement in the district court's 1971 order requires a finding that the seniority system was bona fide. After the district court had declared

unlawful the seniority system, the company's hiring practices, and its educational requirements, the court considered what it called "Complaints of general discriminatory patterns and practices by the Unions." In denying additional relief against the unions, the court stated:

> While no showing of any conscious intent has been made, as part and parcel of the scheme of job seniority which has resulted in racial discrimination to certain black employees as discussed in Part I, *supra*, and permitted the educational qualifications discussed in Part II, *supra*, each union is a proper party to suit and the relief granted in this respect. [Citations]. Otherwise, there is no evidence of any discrimination by the defendant unions and further relief is denied.

The union interprets this statement to mean that "the district court expressly found that the seniority system at Georgia Power was not established or maintained with an intent to discriminate," and argues that this conclusion precludes a finding that the seniority system was not bona fide. Appellee union's brief at 14. We disagree. A failure to show conscious intent to discriminate does not preclude a finding of discriminatory purpose. The Supreme Court observed in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), that when "a clear pattern, unexplainable on grounds other than race, emerges from the effect" of the action even though the action "appears neutral on its face," it is then "relatively easy" to determine that a discriminatory purpose was a motivating factor. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). *See also United States v. Texas Education Agency*, 564 F.2d 162, 168 (5th Cir. 1977), *rehearing denied*, 579 F.2d 910 (1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979). The clear pattern here is unexplainable on grounds other than race. Both the union and the company were found to have been aware of the discriminatory impact of the seniority system. In view of this aware-ness, the 1971 and 1974 findings of the district court clearly show the seniority system here was the result of purposeful discrimination. The district court's statement that "[o]therwise, there is no evidence of any discrimination by the defendant unions" refers not to the establishment and maintenance of the seniority system but rather to the court's earlier finding that there was no showing that the unions had discriminated in processing grievances or complaints.

Both parties cite the recent case of *Smith v. Missouri Pacific Railroad*, 615 F.2d 683 (5th Cir. 1980), as supporting their respective positions. In *Smith*, white employees who had earlier declined to intervene in a settlement decree modifying the employer's seniority system sought, some two years after the final decree, to intervene and have the court set aside its final order on the ground that *Teamsters* had modified or overruled the case law upon which the order was based. The district court refused to permit them to intervene by way of Rule 60(b) motion. This Court affirmed, holding that resolution of either a Rule 60(b) motion for post–judgment relief or a Rule 24(a) motion to intervene was within the sound discretion of the trial judge and that the district court did not err under either of those rules. The *Smith* holding supports the union's position that Rule 60(b) motions are discretionary. The opinion, however, does not specifically address the Government's contention in this case that the Supreme Court's decision in *Teamsters* would not justify a modification of a final decree in an appropriate case.

The seniority system at Georgia Power was not bona fide within the meaning of section 703(h) of Title VII and therefore does not come within the *Teamsters* holding. For that reason, it was not within the discretion of the district court to modify its earlier injunction on the basis of the *Teamsters* holding. We vacate the order modifying the original injunction and remand with directions to reinstate the 1974 decree with respect to the seniority system.

VACATED AND REMANDED.