644 F.2d 1112
 25 Fair Empl.Prac.Cas. 1262,
26 Empl. Prac. Dec. P 31,856
 Joseph TERRELL, Walter Dudley, Thomas Green, Johnny Long,
Albert Mason, Marcus Oakes, Sam Walker, on behalf
of themselves and the class they
represent, Plaintiffs-Appellants,
v.
UNITED STATES PIPE & FOUNDRY CO. et al., Defendants,
Local 2140, United Steelworkers Union Local 342,
International Molders, Allied Workers Union, et
al., Defendants-Appellees.
Joseph TERRELL, Jr., et al., Plaintiffs-Appellants,
v.
UNITED STATES PIPE & FOUNDRY CO. et al., Defendants,
Local 2140, United Steelworkers Union, Defendant-Appellee.
 
 Nos. 80-7107, 80-7256.
 United States Court of Appeals,
Fifth Circuit.
 Unit B
 May 14, 1981.
Rehearing En Banc Denied Aug. 7, 1981.
 Demetruis C. Newton, Birmingham, Ala., Barry L. Goldstein, NAACP Legal Defense & Education Fund, Inc., Washington, D.C., Jack Greenberg, New York City, for plaintiffs-appellants in both cases.
 Joseph P. Hudson, Gulfport, Miss., Daniel B. Edelman, Washington, D.C., for plaintiffs-appellants in 80-7107.
 Lutz Alecander Prager, Paul E. Mirengoff, Warren Duplinsky, Gen. Counsels, EEOC, Washington, D.C., for amicus curiae in both cases.
 Bredoff, Barr, Gottesman, Cohen & Peer, Michael H. Gottesman, Washington, D.C., for Patternmakers League of North America, and United Steelworkers of America.
 Thomas F. Phalen, Jr., Gen. Counsel, Washington, D.C., for Int. Molders & Allied Workers Union & Local 342.
 J. R. Goldthwaite, Jr., Atlanta, Ga., for Internat'l Assoc. of Machinist of Aerospace, Etc. & Boilermakers.
 N. Daniel Rogers, Donald H. Brockway, Jr., Birmingham, Ala., for Local Union 136.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before FAY and HATCHETT, Circuit Judges, and GROOMS*, District Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 This appeal stems from a class action employment discrimination suit brought in 1972 under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2(c), and section 1981 of the 1866 Civil Rights Act, 42 U.S.C. § 1981, by black employees at the Bessemer, Alabama plant of U.S. Pipe and Foundry Company against their employer and their union representatives.[1] Due to pretrial settlements by the company and the electrical workers union, along with the agreement of all parties to a form of injunctive relief and the postponement of trial on the allocation of any back pay liability, this litigation now focuses upon the alleged illegality of the Bessemer seniority system and any resulting liability on the part of five unions. These unions include one industrial union, the United Steelworkers of America (Steelworkers), Local 2140, and four craft unions: the Brotherhood of Boilermakers, Blacksmiths, Forgers, and Helpers (Boilermakers), Local 583; the International Association of Machinists & Aerospace Workers (Machinists), Lodge 359; the International Molders & Allied Workers Union (Molders), Local 342; and the Pattern Makers League of North America (Patternmakers), Birmingham Association.
 
 
 2
 Appellants, the class of black employees, challenge the decision of the trial court that all but one aspect of the Bessemer seniority system was bona fide within the meaning of § 703(h) of Title VII and thus immunized from attack as a seniority system whose discriminatory effects were unintended. See 42 U.S.C. § 2000e-2(h). In addition, appellants challenge the court's procedural ruling that their charges filed with the EEOC in 1969 failed to name as respondents the international unions at the plant so as to permit any Title VII liability on their part to commence 180 days prior to the filing of these charges. See 42 U.S.C. § 2000e-5(f)(1). One of the appellees, the Steelworkers, cross-appeals the refusal of the district court to excuse them from legal responsibility for the seniority system on the separate ground that this predominately black, industrial union actively opposed the largely white, craft unions in the establishment of a seniority system which worked to the disproportionate disadvantage of the Steelworkers. See 42 U.S.C. § 2000e-2(c) (3).
 
 
 3
 We agree with two of these three challenges. We hold that the seniority system at Bessemer was not bona fide under § 703(h), that the Steelworkers bear no legal responsibility for this discriminatory seniority system, but that the Internationals were insufficiently identified by the 1969 EEOC charges to trigger their Title VII liability at that time.
 
 FACTUAL BACKGROUND
 
 4
 U.S. Pipe Co. has a plant in Bessemer, Alabama which manufactures pipe for water and sewage projects. Production and maintenance workers at the plant have elected as their bargaining representatives various craft unions associated with the American Federation of Labor, as well as the non-craft steelworkers union affiliated with the Congress of Industrial Organizations. The district court found that the craft unions represent workers in the higher-skilled, better-paying jobs from which employees have the opportunity to move up in the company. The Steelworkers union represents workers in the least desirable, "dead-end" jobs. The craft unions are virtually all white. The Steelworkers union is predominately black.
 
 
 5
 The district court also found that the racial division between the unions stems partly from the company's historical practice of making job assignments on the basis of race. Discriminatory job assignments reflected the general racism which permeated all aspects of plant operations prior to 1965, from the segregation of employee facilities to the prevention of equal employment opportunities.
 
 
 6
 After passage of the 1964 Civil Rights Act, a major cause of continuing inequality was the seniority system in effect at the Bessemer plant until 1975. The overall seniority system was a composite of separate bargaining agreements negotiated by the company with each union. These agreements were similar, however, in providing that seniority would be measured on the basis of length of service in the applicable seniority unit, with seniority units generally defined by the bargaining units. With few exceptions, an employee who transferred to a new unit received no credit for service to the company in his prior unit. As recognized by the district court, this inhibition upon transfers disproportionately prejudiced those workers in the predominately black Steelworkers union who had been assigned to the least desirable, "dead-end" jobs. The appellants describe the discouraging effect of this system upon black advancement at the plant by pointing to the fate of one black employee who did transfer into a craft unit, losing twenty-six years of plant seniority, only to then lose his job completely as part of a reduction in plant employees which left on the job two white workers with just a few years of seniority in the craft unit. See our recent decisions in U.S. v. Georgia Power Co., 634 F.2d 929 (5th Cir. 1981), and Swint v. Pullman-Standard, 624 F.2d 525 (5th Cir. 1980), for descriptions of the discriminatory operation of seniority systems with "lock-in" provisions such as those at the Bessemer plant.
 
 
 7
 In the early years of plant operations, various craft unions attempted with little success to represent employees in negotiating a collective bargaining agreement. In 1939, six international unions competed strenuously to represent some or all of the employees at the plant. The Steelworkers, associated with the CIO, sought to represent all production and maintenance employees at the plant. Four unions affiliated with the AFL sought to represent employees based primarily upon their craft: the Boilermakers, Machinists, Patternmakers, and Electrical Workers. One other AFL union, the Molders, claimed not only those employees skilled in that craft, but all other production and maintenance employees except those claimed by the other AFL unions.
 
 
 8
 Elections supervised by the NLRB resolved this confrontation between the newly formed CIO, with its strategy of heterogeneous, plant-wide industrial organization, and the older AFL, with its traditional approach of organizing separate, homogeneous craft unions. The Boilermakers, Machinists, Patternmakers, and Electrical Workers prevailed over the Steelworkers among these largely white craft employees. The Steelworkers defeated the Molders among the remaining, predominately black group of employees. "That the elections had racial implications cannot be doubted," according to the district court.
 
 
 9
 Passage of the Taft-Hartley Act enabled the Molders to return to the Bessemer plant in 1949 to attempt "craft severance" from the industrial union represented by the Steelworkers. See 29 U.S.C. § 159(b)(2). Following an NLRB election among the all white employees with molder skills, the Molders union was certified as a separate craft unit.
 
 
 10
 In 1950, the unions formalized existing practices, without the sanction of the NLRB, by switching representation of thirteen positions from one unit to another. Ten jobs given to the Boilermakers and Machinists by the Steelworkers were staffed by white workers. Three positions given to the Steelworkers by the two craft unions were staffed by black workers. Though it continued to represent some white employees, the Steelworkers represented an even higher percentage of black workers as a result of this "swap." The Boilermakers and Machinists joined the Patternmakers and the Electrical Workers in having all white memberships.
 
 
 11
 The bargaining units at Bessemer retained this racially divided structure until the time appellants filed discrimination charges with the EEOC in 1969. In the period directly covered by this lawsuit, U.S. Pipe negotiated collective bargaining agreements with each of the unions in 1968, 1971, and 1974. Prior to this time the Steelworkers had repeatedly advocated plant-wide seniority. Armed in 1968 with the recently enacted Civil Rights Act, the Steelworkers proposed plant-wide seniority on the first day of negotiations. The company expressed a willingness to make the requested changes, but noted the need for the approval of the other unions. The craft unions strongly disapproved of any change, and the "lock-in" provisions remained intact.
 
 
 12
 In 1971, the company initiated the proposal of plant-wide seniority. The Steelworkers met privately with the other unions several times in an effort to gain their agreement to such a system. Again the craft unions prevented any change.
 
 
 13
 In 1974, the Steelworkers met with the craft unions in advance of their separate negotiations with the company in order to advocate plant-wide seniority. The craft unions were intransigent. The Steelworkers then agreed to a united union proposal to the company for plant-wide seniority qualified by a "unit preference" scheme which gave unit members priority consideration for job vacancies. While the Steelworkers and the company continued to express their preference for a complete plant-wide seniority system, both agreed to the compromise proposal.
 
 THE DISTRICT COURT DECISION
 
 14
 The district court upheld the validity of the seniority system except for the 1950 "swap" of positions between the Steelworkers and the Boilermakers and Machinists. The court correctly recognized that in order for a seniority system to be bona fide under § 703(h) of Title VII, it must not have been created or maintained with the intention to discriminate. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The district court properly looked to the four factors extracted by us from the Supreme Court's opinion in Teamsters, and set forth in James v. Stockham Valves & Fittings Co., 559 F.2d 310 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), to assist in determining whether a particular seniority system stems from nondiscriminatory motivations:
 
 
 15
 (1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;
 
 
 16
 (2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);
 
 
 17
 (3) whether the seniority system had its genesis in racial discrimination; and
 
 
 18
 (4) whether the system was negotiated and has been maintained free from any illegal purpose.
 
 
 19
 James, 559 F.2d at 352.
 
 
 20
 The district court found that one of the James factors weighed in favor of appellants: The seniority system had its genesis in racial discrimination. Specifically, the court found that racial considerations played a major role in the elections which produced the original bargaining and seniority units, and in the 1950 "swap" of employee positions between several units.
 
 
 21
 The district court ruled, however, that none of the other three James factors suggested an intent to discriminate through the Bessemer seniority system. Regarding the equality with which the system operated upon all employees, the court noted that the "lock-in" provisions were neutral on their face and as applied. The court acknowledged that "a much larger percentage of blacks than whites would have reason to desire transfer but for the loss of seniority under the rules," and that "the seniority system has been shown to have a discriminatory impact upon black employees." The court believed these facts to be irrelevant to the determination of any racially discriminatory intent.
 
 
 22
 The court also found general rationality in the Bessemer bargaining structure, and thus weighed this factor against a finding of discriminatory purpose. Though fraught with racial overtones, the original configuration of the units was deemed rational when viewed in light of the divisions in the labor movement at the time of the original elections. The court placed significance upon the fact that "notwithstanding discrimination against blacks within their own structures, the Boilermakers and Molders were nevertheless seeking to represent black employees...." The court viewed the fact that the Molders later sought "craft severance" only among the all white employees in skilled positions, to the exclusion of their all black helpers, as fully justified by the NLRB practice of permitting such special elections only among skilled employees. The court recognized that the 1950 "swap" of jobs between unions was neither rational nor in conformity with industry practice. Yet the court treated this final change in the Bessemer bargaining structure as nothing more than an isolated incident which in no way implicated the overall seniority system.
 
 
 23
 The district court ruled that the final James factor, whether the seniority system was negotiated and maintained free from illegal purpose, again weighed in favor of the unions, with the exception of the craft unions involved in the 1950 "swap." The court inferred that the "lock-in" seniority provisions negotiated by all the unions, including the largely black Steelworkers union, reflected non-racial considerations. Craft union maintenance of this system was deemed an effort to prevent competition from other white unions rather than an effort to block encroachment by black workers. The court concluded that racial considerations played a role only in the 1968, 1971, and 1974 negotiations, and then only in the positive context of proposals to remove discriminatory practices.
 
 
 24
 On balance, the court held that the racially discriminatory genesis of the system provided insufficient evidence of an intent to discriminate through the creation and maintenance of the seniority system. Finding the seniority system bona fide under section 703, the court released all unions from liability under Title VII, with the exception of the Boilermakers and Machinists, whose liability was limited to the 1950 "swap." The court released the Steelworkers from liability for their part in this exchange because it found that they acted not out of racial animus, but instead out of a desire to offer representation to black employees in the Boilermakers and Machinists unions who felt discriminated against by these unions.
 
 
 25
 While the district court thus released the Steelworkers from liability, it also ruled that if it had erred in holding the seniority system bona fide, then the Steelworkers must share in union responsibility for that system. The court relied upon a belief that the company, rather than the Steelworkers, acted as the principal advocates of plant-wide seniority. It assumed that the Steelworkers fully supported the 1974 joint union proposal of a "unit preference" restriction upon a plant-wide seniority system.
 
 
 26
 Finally, the district court held that appellants' 1969 EEOC charges failed to name the International Unions as respondents so as to trigger their liability at that time in the subsequent Title VII suit. The court based this conclusion upon the failure of these charges to explicitly name the Internationals.
 
 
 27
 We must determine whether the seniority system was bona fide; whether the Steelworkers are liable for that system; and whether the 1969 EEOC charges sufficiently identified the Internationals as respondents.
 
 THE ILLEGALITY OF THE SENIORITY SYSTEM
 
 28
 Section 703(h) of Title VII exempts certain seniority systems from the reach of the Civil Rights Act of 1964:
 
 
 29
 Notwithstanding any other provision of this Title, it shall not be an unlawful employment practice ... to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system ... provided that such differences are not the result of an intention to discriminate because of race ....
 
 
 30
 42 U.S.C. § 2000e-2(h). We have held that the immunity created by section 703(h) extends not only to Title VII actions, but also bars section 1981 claims. Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Yet the immunity provided by section 703(h) extends to seniority systems with a disparate racial impact only when "differences in treatment (are) not the result of an intention to discriminate because of race." Teamsters, 431 U.S. at 353, 97 S.Ct. at 1863; accord, Southbridge Plastics Division v. Local 759, 565 F.2d 913 (5th Cir. 1978).
 
 
 31
 To assess the purposes underlying the Bessemer seniority system, we turn to the four factors identified in James v. Stockham Valves. The district court correctly found that the Bessemer seniority system had its genesis in purposeful racial discrimination. The record amply supports this conclusion by showing that the system arose in an era of overt racial discrimination at U.S. Pipe, when blacks were assigned to "dead-end" jobs, bargaining seniority units were defined by racial considerations, and seniority provisions allowed transfer to better units only through commission of "seniority suicide." See our refusal to extend section 703(h) immunity to similar seniority systems in Swint v. Pullman-Standard, 624 F.2d 525 (5th Cir. 1980), and United States v. Georgia Power Co., 634 F.2d 929 (5th Cir. 1981). We need not decide whether the court's specific finding of the racial genesis of the Bessemer system is tantamount to a finding of "purposeful discrimination in connection with the establishment ... of the system," James, 559 F.2d at 351, because here, as in Swint and Georgia Power, we find evidence of discriminatory intent under each of the James factors and the totality of all circumstances.
 
 
 32
 The district court clearly erred in concluding that the Bessemer seniority system was negotiated and maintained free of discriminatory purposes. The record before us amply shows that we again face a situation in which
 
 
 33
 the seniority system negotiated through the collective bargaining process tracked and reinforced the purposefully segregated job classification scheme maintained by the company and the conclusion is inescapable that the seniority system itself shared in that same unlawful purpose. The seniority system under the collective bargaining agreement was but part and parcel of the total package of purposeful discrimination at (the company).
 
 
 34
 Georgia Power, 634 F.2d at 936.
 
 
 35
 Even if the district court correctly held that the racially-charged union elections conformed to industry practice, the 1950 racial "swap" of positions, in defiance of all reason, reinforces the conclusion that the Bessemer seniority system was created and maintained unlawfully. We reject the district court's attempt to isolate this aspect of the seniority system so as to restrict union liability to that incident. We instead view this racial adjustment as an integral piece of evidence which manifested underlying racial purposes. The significance of this final alteration of the bargaining structure cannot be underestimated since it removed almost all of the black workers assigned by the NLRB to craft unions.
 
 
 36
 The district court also erred in its consideration of the James factor which focuses upon the equality with which a seniority system operates. The disparate impact of the Bessemer seniority system on black employees is obvious and well documented by the record. The district court recognized this disparate impact but concluded that it was irrelevant. We have since held that disparate impact constitutes not only relevant evidence of discriminatory purpose, Swint, but can conclusively resolve the "equality" factor in favor of those who have suffered such discrimination. See Georgia Power. As for the district court's reliance upon the facial equality with which the Bessemer seniority system operated, we merely note that here again "facial equality ... was but a mask for the gross inequality beneath." Georgia Power, 634 F.2d at 935.
 
 
 37
 Other factors aside from those isolated by James may be considered in determining the purposes underlying a seniority system. See Pettway v. American Cast Iron Pipe Co., 576 F.2d at 1192. One such factor in this case, a factor apparently ignored by the district court, is the overtly discriminatory policies of each of the craft unions at the time the seniority system was created and "corrected" to follow racial lines. At that time, for instance, the Machinists barred blacks from union membership, the Boilermakers relegated blacks to inferior "auxiliary" locals, the Molders segregated the few blacks in their Alabama locals, and the Patternmakers claimed that there were no "qualified niggers" in that state. The Supreme Court has held that a court may take judicial notice of the exclusion of black workers from craft unions on racial grounds, United Steelworkers of America v. Weber, 443 U.S. 193, n. 1, 99 S.Ct. 2721, n. 1, 61 L.Ed.2d 480 (1979), but the record before us provides ample evidence of the overtly discriminatory policies of the craft unions involved in this case. Little purpose would be served by detailing these discriminatory policies. Such policies, however, offer strong additional evidence of racial motivations underlying the seniority system defended by the craft unions in the face of mounting opposition by the company and the Steelworkers.
 
 
 38
 In summary, the totality of circumstances surrounding the creation and maintenance of the seniority system at the Bessemer plant again "leaves us with the definite and firm conviction that a mistake has been made. There can be no doubt, based upon the record in this case, about the existence of a discriminatory purpose." Swint, 624 F.2d at 533 (citations omitted). Our recent decisions in Swint and Georgia Power, overruling conclusions of nondiscriminatory intent, virtually compel condemnation of the Bessemer system because of the striking similarity between the "lock-in" seniority provisions and the comparable clarity of other evidence of discriminatory purpose. As in those cases, we find error in the failure of the district court (1) to consider the disparate impact of such systems, (2) to appreciate the integral importance of particular racial deviations from industry practice, (3) to focus upon additional factors, such as the avowedly racist policies of the craft unions, and (4) to recognize the cumulative effect of separate pieces of evidence of racial motives, evidence which here compelled the specific finding that the seniority system had its "genesis in racial discrimination." We therefore hold that the Bessemer system cannot qualify for the immunity extended by section 703(h) of Title VII only to those seniority systems created and maintained without intention to discriminate. 42 U.S.C. § 2000e-2(h).
 
 THE STEELWORKERS UNION
 
 39
 The district court refused to excuse the Steelworkers from liability for any violation of Title VII by the Bessemer seniority system. The court viewed the Steelworkers' efforts to institute plant-wide seniority as subsidiary to such efforts by the company. The court focused upon the Steelworkers' adoption of the 1974 joint union proposal for "unit preference" as evidence of its failure to support a true plant-wide seniority system. The Steelworkers cross-appeal this decision on the ground that they took every reasonable step to bring about plant-wide seniority. They argue that they settled upon the "unit preference" proposal only because it appeared to represent the best option available in light of craft union resistance to complete plant-wide seniority. Appellants support the court's decision by arguing that while the Steelworkers were not "passive" in opposing the discriminatory seniority system, their efforts to abolish it were "ineffectual." Appellants would have us direct the district court to take into consideration the Steelworkers' relatively commendable conduct when apportioning back pay liability among the unions. We refuse, however, to permit the Steelworkers union to suffer even the label of Title VII liability because the record before us clearly demonstrates that they met the legal requirement of taking every reasonable step to oppose a seniority system which operated primarily to discriminate against its own members.
 
 
 40
 We begin with established principles of law. Section 703(c)(3) of Title VII makes it unlawful for a union to "cause or attempt to cause an employer to discriminate...." 42 U.S.C. § 2000e-2(c)(3). We have recognized that under the Act "(l)abor organizations, as well as employers, have an affirmative duty to take corrective steps to prevent the perpetuation of past discrimination." Myers v. Gilman Paper Co., 544 F.2d 837, 850 (5th Cir.), modified in other respects on rehearing, 556 F.2d 758, cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (citation omitted).
 
 
 41
 The Supreme Court has cautioned against legally excusing a party involved in an employment practice which had been found to violate Title VII: "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of irradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Albermarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (footnote omitted). One reason for caution in excusing a party involved in an unlawful employment practice stems from the congressional purpose of stimulating self-corrective action by employers and unions.
 
 
 42
 It is the reasonably certain prospect of a backpay award that "provide(s) the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history."
 
 
 43
 Albemarle, at 417-18, 95 S.Ct. at 2371-72 (quoting United States v. N. L. Industries, Inc., 479 F.2d 354, 379 (8th Cir. 1973)).
 
 
 44
 Whether a party involved in an established Title VII violation may be excused from liability therefore turns upon whether that party has proved to the full satisfaction of the courts that it has taken every reasonable step to bring employment practices into compliance with the law. In applying this test, we have recognized that even a union which signs a contract establishing an unlawful seniority system may suffer no liability if it actively opposed the adoption of this system. See James v. Stockham Valves.
 
 
 45
 This same test has caused us, in the face of different circumstances, to hold a union liable for a seniority system which resulted from agreements negotiated by another union. In Carey v. Greyhound Bus Co., Inc., 500 F.2d 1372 (5th Cir. 1974), for example, we held the conduct of a union to be violative of Title VII though "disguised by a thin veneer of racial neutrality." This apparent neutrality stemmed from the fact that the union could not negotiate directly with the bus company about the seniority of its members who would transfer to another unit represented by a different union. We discerned that the union had not even made a "concerned attempt" to rectify discriminatory practices since it had not "actively sought" plant seniority. We concluded that the "ineffectual passivism" of the union facilitated the continuance of racial discrimination. We therefore held that this union shared in overall responsibility for the illegal seniority system. In Myers v. Gilman Paper Co., we likewise held a non-signatory union liable for seniority provisions in another union's bargaining agreement on the ground that "(i)t is settled that Title VII required (the non-signatory union) at some point to take 'the affirmative step to initiate negotiations in an effort to salvage for its own ex-members the seniority that they would inevitably and foreseeably lose (upon transfer).' " 544 F.2d at 852 (quoting Carey, 500 F.2d at 1379).
 
 
 46
 After carefully examining the record, we conclude that the Steelworkers diligently sought to bring about a nondiscriminatory, plant-wide system at Bessemer. We reach this conclusion based on the totality of circumstances in this case. In particular, we note the facts stated below.
 
 
 47
 Appellants do not allege any discriminatory practices by the Steelworkers. The district court found that the evidence in this case supported the general observation that the Steelworkers constituted "one of the few institutions in the area which did not function in fact to foster and maintain segregation." The United Steelworkers of America has a well-known history of striving to achieve racial equality and integration in the labor movement.
 
 
 48
 The Steelworkers local at Bessemer was consistently represented by black officials who had every reason to oppose a seniority system which disproportionately prejudiced its predominately black membership. These officials appear to have taken every reasonable step to bring about plant-wide seniority, from initiation of this proposal on the first day of the 1968 negotiations with the company, to private lobbying efforts in 1971 and 1974 with the craft unions. Their acceptance of the "union preference" system in 1974 clearly represented a reasonable decision to gain some improvement, rather than suffering complete defeat at the hands of the craft unions.
 
 
 49
 In view of these and other circumstances evidenced by the record, we absolve the Steelworkers from any responsibility under Title VII for the discriminatory seniority system at the Bessemer plant. In so holding, we advance the congressional purpose of stimulating self-corrective union action against illegal employment practices. The penalty of back pay liability for those unions which passively acquiesce in discriminatory practices is matched with judicial recognition of those unions which have opposed such violations of the law through every means in their power.
 
 THE LIABILITY OF THE INTERNATIONAL UNIONS
 
 50
 The precise procedural issue before us is whether the original charges filed by appellants with the EEOC identified the Internationals as respondents within the meaning of that portion of Title VII which authorizes legal action only against parties "named" in the administrative charge. 42 U.S.C. § 2000e-5(f) (1).[2] The Internationals successfully argued in the trial court that they had not been named. Appellants claim on appeal that the Internationals were sufficiently identified in the charges to fulfill the purposes of the Act. We disagree. The significance of this controversy and our conclusion becomes clear, however, only in the context of the procedural history of this case.
 
 
 51
 Appellants first filed charges with the Commission in 1969. The district court ruled that these charges failed to identify the Internationals as respondents, though they indisputably named the Locals. In 1972, appellants brought this legal action under both Title VII and section 1981, naming the Internationals along with the Locals as defendants. Appellants then amended their original EEOC charges in 1973 to explicitly name the Internationals as respondents.
 
 
 52
 Commission regulations mandate that amended charges which merely clarify or amplify allegations in a prior charge shall "relate back" to the effective date of the earlier charge.[3] See Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228 (5th Cir. 1969). The district court ruled, however, that it would be "improper" in this case to treat the amendments as relating back to the date of the original charges. The court viewed the amended charges as an attempted "addition" of the Internationals as respondents, rather than as a mere clarification of previously identified parties.[4]
 
 
 53
 Only parties previously identified as respondents in charges filed with the EEOC are subject to subsequent liability under Title VII. 42 U.S.C. § 2000e-5(f)(1). All parties to this suit are in agreement that Title VII limits the liability of such respondents to matters occurring within 180 days of the filing of administrative charges. There is also no dispute that the limitations period in this case for liability under section 1981 extends for one year, with the one year period measured from the commencement of judicial proceedings.
 
 
 54
 The district court applied these limitations periods to the Internationals in a manner consistent with its conclusion that they were unnamed in the original EEOC charges. The court ruled that the period of potential liability of the Internationals under Title VII began only in 1973, i. e., 180 days prior to their "addition" as respondents in the amended charges. The court extended their possible liability back to 1971 under section 1981, i. e., one year before the filing of the suit in 1972. The court refused to treat the Internationals in the same manner as the Locals when ruling that any Title VII liability on the part of the Locals commenced 180 days prior to the original 1969 charges.
 
 
 55
 Appellants challenge this restriction upon the potential liability of the Internationals. They argue that the district court erred in holding that the 1969 EEOC charges failed to identify the Internationals as respondents. They insist that the 1973 amended charges merely rendered explicit the clear implication of the Internationals as respondents in the original charges. Appellants therefore contend that the district court committed reversible error in refusing to relate the explicit naming of the Internationals in the amended charges back to the date of the original charges.
 
 
 56
 We begin with certain well-established principles. The remedial purposes of Title VII, and the paucity of legal training among those whom it is designed to protect, require that a court construe an EEOC charge with the utmost liberality. E. g., Tillman v. City of Boaz, 548 F.2d 592 (5th Cir. 1977) (liberality required in interpreting the parties named); Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970) (liberality required in interpreting the discrimination alleged). "For a lay-initiated proceeding it would be out of keeping with the Act to import common-law pleading necessities to this 'charge,' or in turn to hog-tie the subsequent lawsuit to any such concepts." Jenkins v. United Gas Corp., 400 F.2d 28, 30 n.3 (5th Cir. 1968). A court called upon to interpret such a charge must bear in mind that a fundamental purpose of the charge is to trigger an investigation by the EEOC. "All that is required is that (a charge) give sufficient information to enable EEOC to see what the grievance is about." Id. The necessity for equally broad interpretation of such a charge at the administrative and judicial levels stems from the framework of Title VII and its goal of encouraging voluntary compliance through EEOC conciliation.
 
 
 57
 The Commission, which must operate on the basis of the administrative charge, rarely drawn by an attorney, must therefore view the charge in its broadest reasonable sense in order to effectively attempt to eliminate, by the administrative process, the discriminatory practices and policies which it finds.... Lacking enforcement powers, the Commission's disputes resolution machinery could not succeed if the federal courts were not in a position to review the complaint filed in a section 706 proceeding as broadly as the Commission views the charge.
 
 
 58
 Sanchez, 431 F.2d at 467 (quoting the amicus brief of the EEOC); see Tillman v. City of Boaz, 548 F.2d 592 (5th Cir. 1977) (deference should be given to EEOC interpretation of a charge). Such policy considerations have caused this court to adopt a rule of reason which permits the scope of a Title VII suit to extend as far as, but no further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge.
 
 
 59
 The logic of this rule is inherent in the statutory scheme of Title VII. A charge of discrimination is not filed as a preliminary to a lawsuit. On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC.... Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than the words of the charge which originally triggered the investigation.
 
 
 60
 Sanchez, 431 F.2d at 466.
 
 
 61
 The reasonable limits of an investigation potentially triggered by an EEOC charge define not only the substantive limits of a subsequent Title VII action, but also the parties potentially liable in that action. See, e. g., Tillman v. City of Boaz, 548 F.2d 592 (5th Cir. 1977); Kaplan v. International Alliance of Theatrical and Stage Employees, 525 F.2d 1354 (9th Cir. 1975). In Kaplan, the Ninth Circuit focused upon a factual statement in an EEOC charge which explicitly named only a local union, but which necessarily implicated an international union in the alleged discrimination. The court reasoned that the fact that a contract specifically complained of had clearly been negotiated by the International sufficed to apprise the EEOC in "general terms" of the possible complicity of the International. The Kaplan court held that such general notice to the EEOC was sufficient to permit the International to be named as a defendant in a subsequent suit under Title VII. In so holding, the court relied primarily upon well-established rulings of this court.
 
 
 62
 Our more recent decision in Tillman v. Boaz again looked to the factual allegations of an EEOC charge, and the scope of ensuing EEOC efforts, in liberally interpreting the parties named in the charge. In Tillman, we held that the City of Boaz, Alabama, was liable under Title VII although it was not specifically named as a respondent, because a letter to the EEOC, specifically incorporated by reference in the EEOC charges, stated that "I would like to file a claim against the City of Boaz ...." and the charges themselves listed the City of Boaz as the employer who discriminated against the plaintiff. Pursuant to that letter and the accompanying charges, the EEOC investigated the City as well as its mayor, the named respondent. In that situation, we had no difficulty concluding that both the EEOC and the City had sufficient notice that the City was charged to justify imposing liability on the City.
 
 
 63
 Applying these precedents and principles favoring liberality to the facts now before us, we must nevertheless conclude that the Internationals were insufficiently implicated in the discrimination alleged in appellants' original charges to have reasonably triggered EEOC investigation of the Internationals. These charges failed to allege specific conduct which clearly implicated the Internationals. Quite reasonably, the EEOC then omitted the Internationals in its investigative and conciliatory efforts. The Internationals thus failed even to receive informal notice that they had been named through the Commission's administrative processes. Apparently recognizing that they had made a serious, substantive mistake not a mere technical error of pleading appellants amended their original EEOC charges to explicitly name the Internationals. Without holding appellants to the same level of draftsmanship as trained attorneys, we are constrained by the facts in this case to uphold the decision of the district court that no liability of the Internationals under Title VII shall commence until 180 days prior to these 1973 amended charges.
 
 CONCLUSION
 
 64
 Because the record clearly demonstrates racially discriminatory purposes underlying the creation and maintenance of the Bessemer seniority system, we hold that it is not bona fide within the meaning of 42 U.S.C. § 2000e-2(h). Since the Steelworkers union took every reasonable step to eradicate this discriminatory system, we exclude them from any liability for that system under 42 U.S.C. § 2000e-2(c)(3). Finally, the fact that the allegations in appellants' 1969 EEOC charges did not clearly implicate the international unions causes us to hold that these charges did not trigger their liability at that time under 42 U.S.C. § 2000e-5(f)(1).
 
 
 65
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 *
 District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 This is a consolidated interlocutory appeal under 28 U.S.C. § 1292(b) and Federal Rule of Civil Procedure 54(b)
 
 
 [2]
 29 C.F.R. § 1601.12(h) provides:
 A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations therein. Such amendment ... will relate back to the date the charge was first received.
 Originally adopted in 1965 and numbered § 1601.11(9), this regulation was amended in 1979, without altering its substantive content to read as set forth above.
 
 
 [3]
 42 U.S.C. § 2000e-5(f)(1) provides that upon compliance with certain procedures fully met by appellants "a civil action may be brought against the respondent named in the charge" previously filed with the EEOC
 
 
 [4]
 The district court announced and explained its ruling as follows:
 It is clear from the reading of the amended EEOC charges dated August 2, 1973, which were prepared with the assistance of counsel experienced in discrimination matters, that the international unions were being added as respondents. The EEOC's earlier findings and right-to-sue letters had, consistently with the wording of the original charges, treated only the local unions and company as respondents prior to that date. While the amended EEOC charges, even though filed ten months after the institution of the lawsuit, are certainly to be recognized as effective against the internationals when filed, it would be improper to treat them as "relating back" for limitations' purposes to the earlier charges.
 The district court therefore held that the potential liability of the Internationals commenced in 1971 under section 1981.