James **HOWARD** and Robert Bates, individually and on behalf of all others similarly situated, Plaintiffs-Appellants, Cross-Appellees,

Willie L. McCoy, et al., Intervening Plaintiffs-Appellants, Cross-Appellees,

v.

**INTERNATIONAL MOLDERS AND ALLIED WORKERS UNION, AFL–CIO–CLC, Local # 100 of the International Molders and Allied Workers Union, AFL–CIO–CLC, Defendants-Appellees, Cross-Appellants.**

No. 85–7008.

United States Court of Appeals, Eleventh Circuit.

Jan. 14, 1986.

O. William Adams, III, Birmingham, Ala., for appellants.

George C. Longshore, Birmingham, Ala., Thomas F. Phalen, Jr., Cincinnati, Ohio, for defendants-appellees, cross-appellants.

Before GODBOLD, Chief Judge, JOHNSON, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from a judgment dismissing a complaint filed by a class of employees against the Clow Corporation and defendant Union on charges of racial discrimination in employment practices.

## I. STATEMENT OF THE CASE

Early in the proceedings, a consent decree was entered between the Clow Corporation, the employer, and the class of plaintiffs. However, the suit continued as against the labor organization under the provisions of 42 U.S.C. § 2000e–2(c)(3).[1] Plaintiffs also proceeded under the provisions of 42 U.S.C. § 1981.

At the trial, plaintiffs laid great stress upon the discriminatory effect on blacks of the departmental system under which most blacks were employed in the lowest paying department and under which there was only departmental seniority for promotion. They also stressed the fact that as to certain jobs, an unvalidated test was required by the employer and that the labor organization failed adequately to oppose the unvalidated testing requirement.

The trial court held that the seniority policy of the employer was carried out in good faith and held that plaintiffs had failed to establish any discriminatory practice thereabouts. With respect to the unvalidated testing, however, the court adopted what it called the *"Terrell"* standard as measuring the duty of the Union under its obligation of fair representation. This standard was established in *Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112, 1120 (5th Cir., Unit B, 1981):

> We begin with established principles of law, Section 703(c)(3) of Title VII makes it unlawful for a union to "cause or attempt to cause an employer to discriminate." ... 42 U.S.C. § 2000e–2(c)(3). We have recognized that under the Act: [l]abor organizations, as well as employers, have an affirmative duty to take corrective steps to prevent the perpetuation of past discrimination." *Myers v. Gilman Paper Co.*, 544 F.2d 837, 850 (5th Cir.), *modified in other respects on rehearing*, 556 F.2d 758, *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). (citation omitted).

Recognizing the effect of the *Terrell* decision, the trial court made the following findings of fact and conclusions of law:

> Plaintiffs allege that defendants violated 42 U.S.C. § 2000e–2(e)(3) ad 42 U.S.C. § 1981 by acquiescing in the administration by the employer of facially neutral tests that had an adverse impact on plaintiffs. To prevail on this claim, plaintiffs must establish first that the mechanical comprehension test used by the company violated Title VII, and second, that defendants failed to comply with the *Terrell* "every reasonable step" standard.[17]

The Supreme Court ruled in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 [91 S.Ct. 849, 853, 28 L.Ed.2d 158] (1971), that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessi-

---

1. Section 42 U.S.C. 2000e–2(c)(3) provides:
   It shall be an unlawful employment practice for a labor organization ...

   (3) To cause or attempt to cause an employer to discriminate against an individual in violation of this section.

ty. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." A plaintiff makes out a prima facie case of discrimination by showing "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280] (1975). The employer then has the burden to establish that the test is job related. *Id.*

Clow Corporation used the mechanical comprehension test as a condition to promotion from 1965 (the effective date of Title VII) until 1977 (when this suit was filed). During those years, 56% (103 of 184) of the white employees who took the test passed it; only 12.5% (10 of 80) of the black employees who took the test passed it. The court concludes that plaintiffs established their prima facie case of disparate impact discrimination. Defendants did not rebut this presumption with any proof that the test was job related. Accordingly, the court concludes that plaintiffs established that the company's mechanical comprehension test, although neutral in form, had a discriminatory impact and violated Title VII.

Next the court must determine whether the union defendants satisfied the *Terrell* standard. Union representative Robert Hollman criticized the company's use of the test on January 19, 1970. White members of the union committee demanded that the company cease using the tests on August 11, 1975. The court has pointed out that the union members never demanded that the union attempt to persuade the company to stop using the tests through the grievance procedure in 1970. There was no evidence that the union committee ever demanded during the 1972, 1974, or 1977 negotiations that the company cease using the tests. Defendants did not establish that

the company would have refused to stop using the tests.[18] The company's abandonment of the tests when this suit was filed illustrates that the company would have considered agreeing to halt the use of the tests. Accordingly, the court concludes that the local union violated 42 U.S.C. § 2000e–2(c)(3) because it did not satisfy the *Terrell* standard of taking every reasonable step to ensure that the employer complies with Title VII. Additionally, the court concludes that the local union violated 42 U.S.C. § 1981 because its conduct evidenced an intent to discriminate.[19]

An international union can be held liable for a discriminatory practice if it has a "sufficient connection" with the discriminatory practice. *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 851 (5th Cir.), *cert. dismissed*, 434 U.S. 801 [98 S.Ct. 28, 54 L.Ed.2d 59] (1977). The Fifth Circuit in *Myers* adopted the holding of the Fourth Circuit in *Patterson v. American Tobacco Co.*, 535 F.2d 257, 270–71 (4th Cir.), *cert. denied*, 429 U.S. 920 [97 S.Ct. 314, 50 L.Ed.2d 286] (1976): "The Fourth Circuit recently held that a sufficient connection exists where, as here, the international union provided 'an advisor' to the local in its negotiations and the international approved the resultant collective bargaining agreement." *Myers v. Gilman Paper Corp.*, 544 F.2d at 852. The court has found above that Hildridge Dockery, the International Molders representative for the Local Union, worked closely with the bargaining committee for an advisor from 1972 until 1980. The court concludes that Dockery's activities provide a sufficient connection of the International to the Local Union's violation of Title VII and § 1981. Accordingly, pursuant to *Myers v. Gilman Paper Corp.*, the court concludes that the International also violated 42 U.S.C. § 2000e–2c)(3) and 42 U.S.C. § 1981 for its conduct regarding the company's mechanical comprehension test.

---

[17] Although the Fifth Circuit in *Terrell* and *Walker* applied this standard to situations in-

volving seniority systems, this court assumes that the Fifth Circuit would always apply this standard to a labor organization's conduct that is challenged under 42 U.S.C. § 2000e–2(c)(3).

[18] This situation is to be compared to the seniority system situation: there this court found that "the company had no intention of making any further concessions regarding the seniority system." *See* p. 36 *supra.*

[19] Labor organizations violate 42 U.S.C. § 2000e–2(c)(3) if they *"cause* or *attempt to cause* an employer to discriminate...." (emphasis added). The court is of the opinion that this language indicates that conduct which violates the section (2000e–2(c)(3)) constitutes intentional discrimination.

Thereafter, on the 21st day of June, 1983, the court entered the following order:

In conformity with the findings of fact and conclusions of law entered herein on June 1, 1983, the court finds in favor of the plaintiffs and against the defendants for their violation of 42 U.S.C. § 2000e–2–(c)(3) and 42 U.S.C. § 1981, for its conduct regarding the use of the mechanical comprehension test. The court denies all other claims made by the plaintiffs.

Within forty-five (45) days from the date of this order is entered, the parties will attempt to arrive at an amount of monetary remedy for the plaintiffs to compensate them for the defendants' discriminatory conduct with respect to the mechanical comprehension test. If the parties are unable to arrive, in good faith, at a monetary remedy, then the court will enter such further orders or decrees as are necessary to enable the parties to produce for the court their own procedures and formulas for the calculation of the monetary remedy due the plaintiffs. The court notes that the parties may reach such an accord as to amounts, etc., while reserving the right to appeal or seek other post-trial relief.[1]

[1] The court has considered the objection of defendants to plaintiffs' proposed judgment and considers them most appropriate for post-judgment consideration.

The court then submitted to the magistrate acting as special master, the task of determining the damages that would be due to the class based upon the court's order. The special master, finding that 52 percent of the vacancies that occurred during the statutory period had been filled by blacks, and only 48 percent by whites, decided that there was no justification for the award of any damages to the plaintiff class. The finding and conclusion to this effect follows:

In conclusion, the magistrate finds that 25 vacancies requiring passage of the test existed during the time in question. Of the total employees tested during the pertinent time period, 35.6% (or, using the figures of plaintiffs' counsel, 39.5%) were black. Of the 25 job vacancies, 52% of them were filled by black employee bidders.

### Conclusion of Law

Applying the assumptions specified by the Court to the above findings, black employees filled job vacancies to a *greater* extent than the proportion of black employees who were tested. If it is assumed that black employees should have passed the tests and subsequently filled the vacancies in proportion to the number of black employees who took the tests, then only 35.6% (or 39.5%, using plaintiffs' figures) of the black employees should have filled the vacancies. In fact, black employees filled the vacancies to the extent of 52%.

Finding that black employees filled vacancies to a greater extent than the proportion of black employees who were tested, the magistrate concludes that, applying the formula specified by the Court, the sub-class of plaintiffs is not entitled to any back pay and that no damages should be required to be paid by the defendants.

By order of November 29, 1984, the trial court adopted the special master's report by the following order:[2]

This cause came on to be heard after the court had referred this action to a Magistrate as Special Master for a hearing with regard to damages after the court had found the defendant unions liable under Title VII for failing to take every reasonable step to insure that the employer complied with Title VII by abandoning the tests which had a discriminatory impact on black employees.[1]

The plaintiffs have objected to the report of the Special Master and the court has conducted a hearing thereon. The court finds and concludes that the report of the Special Master is factually accurate and the court accepts and adopts the same.[2]

The court, *sua sponte*, asked the parties to address whether *Connecticut v. Teal*, 457 U.S. 450 [440, 102 S.Ct. 2525, 73 L.Ed.2d 130] (1982) had application to the case. After receiving briefs from the parties, the court has determined that it does not. The court had already determined that the defendant unions were *liable*. The remaining issue was whether the class had suffered damages during the designated period. The court followed the procedures specified in *United States v. U.S. Steel*, 520 F.2d 1043 (5th Cir.1975) and *Pettway v. ACIPCO*, 681 F.2d 1249 [1259] (11th Cir.1982). This procedure resulted in a determination that the class suffered no injury or damages for the designated period. The plaintiffs have not proved, for the appropriate period, an actual wage loss as the result of discrimination. The class not having suffered any injury as the result of the failure of the unions to take action, the plaintiffs are not entitled to a recovery of back pay from these defendants.

---

[1] This court was likely incorrect stating that same failure resulted in a finding of intentional

**2.** It is necessary to quote the several orders of the trial court, because in at least two of them,

discrimination under 42 U.S.C. § 1981. The court did not and does not make the finding that there was otherwise direct or circumstantial proof of intentional discrimination.

[2] The court, in effect, replicates the Magistrate's findings.

On December 3, 1984, the court filed the following memorandum opinion.

The court hereby amends it Memorandum Opinion filed on November 29, 1984 to add the following sentence.

It may well be that, since there is no indication of any disparate impact, during the relevant period, the court should conclude that not only have plaintiffs failed to prove any damages for the relevant period, but that the court's finding and conclusion of liability should be vacated. The court also cites *Ingram v. Madison Square Garden*, 709 F.2d 807 (2nd Cir.1983).

A timely appeal was filed by the plaintiffs from the final judgment of November 29. A cross-appeal was filed by the unions from the determination by the trial court that they were "liable" to the plaintiffs. By doing so, they apparently did not consider the December 3 order as having withdrawn the trial court's earlier judgment. Because of the ambiguous manner in which the court dealt with this matter—"it *may be* that the court's finding and conclusion of liability *should be vacated,*" we cannot determine whether the finding of liability was actually withdrawn. The defendant-cross-appellant unions appeal from this finding, so they apparently assume that it still represents the judgment of the trial court. Since we conclude that the plaintiffs had established liability without regard to the finding of no damages, we need not resolve this issue. The plaintiffs filed a motion for an interim award of attorney's fees which the trial court denied under the following order on January 4, 1985: "Motion denied pending appeal. Leave granted to refile if judgment reversed."

earlier orders are modified.

## II. ISSUES

The issues before this Court are:

1. Did the trial court err in finding that the defendant unions were not liable for the operation of the seniority system as it existed at Clow?

2. Did the district court correctly decide that the unions were liable to the plaintiff class on account of their failure adequately to insist on the elimination of the unvalidated testing?

3. Did the trial court err in finding that no damages were due to the plaintiff class because the "bottom line" showed that a disproportionately high number of class members were employed during the relevant statutory period in spite of the existence of the non-validated tests?

4. Did the trial court err in not granting interim attorney's fees?

## III. DISCUSSION

The trial court requested the parties to brief the question whether *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) was applicable to the court's decision in this case. Following the filing of briefs, the court held, as noted above, that it was not applicable, because the court had already held the defendants *liable.* However, the court failed to consider that in its December 2, 1983 order, after it had decided that no damages were due, it stated that it had been wrong in finding liability. As we read *Teal*, however, it was expressly in a case in which the "bottom line", so-called, showed no damages due to the class that the court's reasoning in *Teal* becomes important. In that case, four black plaintiffs were holding temporary positions of a supervisory nature. In order to obtain permanent appointments to these positions they were required, as was everyone else, to pass a written test which had not been validated. By the time the case came to trial, it was apparent that the State of Connecticut had actually promoted two of the plaintiffs which resulted in a "bottom line" reflecting that the members of the class had received the promotions they would have received if they had passed the test in a higher proportion than the percentage they bore to the percentage in the workforce. The Court, holding that Title VII was designed to guarantee to every minority person an equal "opportunity" for employment and promotion, said:

Petitioners' examination, which barred promotion and had a discriminatory impact on black employees, clearly falls within the literal language of § 703(a)(2), as interpreted by *Griggs.* The statute speaks, not in terms of jobs and promotions, but in terms of *limitations* and *classifications* that would deprive any individual of employment *opportunities.* A disparate-impact claim reflects the language of § 703(a)(2) and Congress' basic objectives in enacting that statute: "to achieve equality of employment *opportunities* and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." 401 U.S. at 429–30 [91 S.Ct. at 853] (emphasis added). When an employer uses a non-job-related barrier in order to deny a minority or woman applicant employment or promotion, and that barrier has a significant adverse effect on minorities or women, then the applicant has been deprived of an employment *opportunity* "because of ... race, color, religion, sex, or national origin." In other words, § 703(a)(2) prohibits discriminatory "artificial, arbitrary, and unnecessary barriers to employment," 401 U.S. at 431 [91 S.Ct. at 853], that "limit ... or classify ... applicants for employment ... in any way which would deprive or tend to deprive any individual of employment *opportunities.*" (Emphasis added.)

Relying on § 703(a)(2), *Griggs* explicitly focused on employment "practices, procedures, or tests," 401 U.S. at 430, [91 S.Ct. at 853], that deny equal employ-

ment "opportunity," *id.* at 431 [91 S.Ct. at 853]. We concluded that Title VII prohibits "procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups." *Id.*, at 432 [91 S.Ct. at 854]. We found that Congress' primary purpose was the prophylactic one of achieving equality of employment "opportunities" and removing "barriers" to such equality. *Id.* at 429–430 [91 S.Ct. at 852–853]. See *Albemarle Paper Co. v. Moody,* 422 U.S. at 417 [95 S.Ct. at 2371]. The examination given to respondents in this case surely constituted such a practice and created such a barrier.

457 U.S. at 448, 102 S.Ct. at 2531 (footnote omitted.) (Emphasis in original.)

In the context of this case, it seems clear that this means that even though a slight majority of minority employees actually filled the vacancies after having passed the test, this did not ameliorate the condition of the remaining members of the class who failed to pass it and who should have had an "opportunity" to fill the vacancies without facing the headwinds of the unvalidated test.

The trial court called on the parties to submit proposed methods of determining the damages that should be awarded to the class in light of its determination that the defendants were liable to the plaintiffs on account of the unvalidated test. Although the petitioners submitted a plan, the special master determined that it was not necessary to consider the potential damages to the non-successful members of the class, because of the "bottom line" success of the class as a whole. This, it seems clear under *Teal,* was error. Once the trial court found that the mechanical aptitude test had, during its entire period of operation, had a disparate impact on the minority class, it follows that it was the duty of the defendant unions under the *Terrell* standard to make every reasonable effort to see that these tests were brought to an end. This, the trial court found, they had failed to do. As we read *Teal,* every mem-

ber of the class who failed to pass the test, was injured by the requirement that he do so before he could achieve the desired promotion. The special master should have made an effort to measure the damages suffered by such individuals. This he failed to do because he concluded that since the class as a whole had shown up better than expected in spite of the requirement that its members pass the unvalidated test, no damages were due the class for the injury they suffered.

So far as appears from the record before us, if the failure of the other members of the class had not prevented them from being considered for advancement, every one of the vacancies might have been filled by one of them. Any one of them might have had qualities of excellence that would have recommended them to their employer for filling one of the vacancies. Again, we quote from *Connecticut v. Teal:*

In short, the District Court's dismissal of respondents' claim cannot be supported on the basis that respondents failed to establish a prima facie case of employment discrimination under the terms of § 703(a)(2). The suggestions that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria. Title VII strives to achieve equality of opportunity by rooting out "artificial, arbitrary, and unnecessary" employer-created barriers to professional development that have a discriminatory impact upon individuals. Therefore, respondents' rights under § 703(a)(2) have been violated, unless petitioners can demonstrate that the examination given was not an artificial, arbitrary, or unnecessary barrier, because it measured skills related to effective performance in the role of Welfare Eligibility Supervisor.

*Id.* at 451, 102 S.Ct. at 2532 (emphasis in original.)

It is, therefore, clear that the unions in this case are liable, because they did not use all reasonable effort to cause the employer to put an end to the use of the non-validated tests for promotion.

Since the special master, and thus, the trial court, made no effort to determine whether damages could be proven with respect to the members of the class who had failed the test, the case will have to be remanded to the trial court for this determination. In the event that the plaintiffs are unable to make adequate proof of such damages, they would be entitled to nominal damages in any event:

> Nominal damages are presumed to follow from the violation of any valuable legal right, even if no actual damages are involved. *Basista v. Weir*, 340 F.2d 74, 87 (3rd Cir.1965); *Magnett v. Pelletier*, 360 F.Supp. 902, 907 (D.Mass.1973). "The term nominal damages means a trivial sum—usually one cent or one dollar—awarded to a plaintiff whose legal right has been technically violated but who has proved no real damage." *Chesapeake & Potomac Tel. Co. v. Clay*, 90 U.S.App. (D.C. 206), 194 F.2d 888, 890 (1952).

*Tatum v. Morton*, 386 F.Supp. 1308 (1974).

In the *Basista* case cited in the above quotation, the Court held as a matter of federal common law: "It is not necessary to allege nominal damages and nominal damages are proved by proof of deprivation of a right to which the plaintiff was entitled." *Basista v. Weir*, 340 F.2d at 87.

Dealing with the appellant's contention that the trial court erred in finding that the defendant unions were not liable for the operation of the seniority system as it existed at Clow, we note that this decision by the trial court was largely a finding based on disputed facts. While the factfinder might have decided differently on this question, we are unable to conclude that the trial court's decision on the seniority issue was clearly erroneous. Finally, appellants complain of the failure of the trial court to award interim attorneys' fees. We conclude that the trial court did not abuse its discretion in postponing this issue until this appeal was perfected. Upon remand, this issue, of course, will be open for the trial court's consideration at the time it issues its final judgment.

## IV. CONCLUSION

The judgment is **REVERSED** and the case is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.